THOMPSON ELECTRIC, INC. ET AL., APPELLANTS, *v.*
BANK ONE, AKRON, N.A., APPELLEE.

[Cite as Thompson Electric, Inc. *v.* Bank One, Akron, N.A. (1988),
37 Ohio St. 3d 259.]

(No. 87-798—Submitted March 16, 1988—Decided July 6, 1988.)

*Guy, Lammert & Towne, Ronald N. Towne* and *Cathy S. Drescher,* for appellee.

WRIGHT, J. In 1977, the Ohio General Assembly enacted R.C. 1311.011 and 1311.012, which materially altered the rights of residential property owners, mechanic's lien claimants, and lending institutions. This legislation, which is commonly known as the "Home Owners Amendment" to the mechanic's lien statutes, changed the respective rights of the various parties involved in the construction or improvement of residential property with the intended result of protecting the property owner and simplifying the procedure for obtaining a mechanic's lien. Distelhorst & Marti, Ohio Mechanics' and Materialmen's Liens (1986) 107, Section 9-1. See, also, Weinberger, Ohio Supplemental Mechanics' Lien Law (1981), 8 N. Ky. L. Rev. 277.

Today, we are asked to interpret R.C. 1311.011, with particular emphasis on the issue of whether subcontractors are protected parties under R.C. 1311.011(B)(5), and, if so, the manner and extent to which a lending institution is liable to such parties.

R.C. 1311.011(B)(4) specifies the duty of a lending institution:

"No lending institution shall make any payment to any original contractor until the original contractor has given the lending institution his affidavit stating:

"(a) That the original contractor has paid in full for all work performed and for all labor, materials, machinery, or fuel furnished by the original contractor and all subcontractors, materialmen, and laborers prior to the date of the closing of the purchase or during and prior to the payment period, except such unpaid claims as the original contractor shall specifically set forth

*Hoover, Heydorn & Hoover Co., L.P.A., Orval R. Hoover, Robert W. Heydorn* and *John M. Herrnstein,* for appellants.

and identify both by claimant and by amount claimed;

"(b) That no claims exist other than those claims so set forth and identified in the affidavit required by division (B)(4) of this section."

R.C. 1311.011(B)(5) specifies the parties to whom the lending institution owes a duty:

"When making any payment under the home construction contract or on behalf of the owner or part owner under a home purchase contract, the lending institution may accept the affidavit of the original contractor required by division (B)(4) of this section and act in reliance upon it, unless it appears to be fraudulent on its face. The lending institution shall not be financially liable to the owner, part owner, purchaser, lessee, or any other person for any payments, except for gross negligence or fraud committed by the lending institution in making any payment to the original contractor.

"After receipt of a written notice of a claim of a right to a mechanic's lien by a lending institution, failure of the lending institution to obtain a lien release from the subcontractor, materialman, or laborer who serves notice of such claim is prima-facie evidence of gross negligence."

Three issues are disputed and must be resolved in deciding this appeal: (1) whether Jeffrey J. Purcell or his company, Joseph Purcell & Sons, Inc., was the "original contractor," as defined in R.C. 1311.011(A)(4); (2) whether subcontractors are a class of persons that the General Assembly intended to protect under R.C. 1311.011 (B)(5); and (3) if subcontractors are protected under R.C. 1311.011(B)(5), whether Bank One acted in a grossly negligent manner in this particular case.

I

R.C. 1311.011(A)(4) states that an

" '[o]riginal contractor' includes any person with whom the owner, part owner, lessee, or purchaser under a home purchase contract has directly contracted."

This statute sets out two essential elements. First, the original contractor must be a "person," as that term is used within the context of the mechanic's lien statutes. Second, the original contractor must be in direct privity of contract with the owner under a home purchase contract.

"The first element goes to the contractor's legal status apart from the mechanics' lien statutes. Section 1311.01(E) of the Ohio Revised Code, which by its own terms applies to section 1311.011, provides that a person, as that term is used in the mechanics' lien statutes, refers to corporations, partnerships, and joint ventures as well as to natural persons. Hence, an original contractor may be either a natural person or organized as one of these artificial entities.

"The second element goes to the contractor's relationship to the improved property. In order to be considered an 'original contractor,' he must be in direct privity of contract with * * * a purchaser of property which is the subject of a home purchase contract." (Footnote omitted.) Distelhorst & Marti, supra, at 113, Section 9-4.

Under the first element, it is apparent that either Jeffrey Purcell, as a natural person, or Joseph Purcell & Sons, Inc., as a corporate entity, could be classified as the original contractor. Appellants argue and the trial court found that Joseph Purcell & Sons, Inc. was the original contractor. On the other hand, appellee contends that Jeffrey Purcell, individually, was the original contractor. To determine which argument is correct, we must examine which party — the corporation or the individual — had direct

privity of contract with the ultimate homeowners.

The primary evidence presented at trial to indicate possible privity between the homeowners and the corporation was the purchase agreement, which was a pre-printed form that recited an agreement between Joseph Purcell & Sons, Inc. and the ultimate homeowner to build a home on a particular piece of property. The agreement was signed by the ultimate homeowner and Jeffrey Purcell, ostensibly accepting on behalf of the corporation. But Purcell did not follow normal corporate practice by indicating beneath his signature the corporate capacity in which he was signing, if any. "[A document] [p]rima facie a contract on its face appearing to be that of a corporation but signed only with the name of an individual is not binding on the corporation." 7 Fletcher, Cyclopedia of the Law of Private Corporations (1978) 172, Section 3035. Also, generally the president of the company is the proper officer to sign a binding contract. *Id.* at 165, Section 3033. Jeffrey Purcell was vice-president of the corporation. While the general rules set forth above are not immutable, *no* evidence was offered to show that they should not apply in this case.

Nearly all other relevant documents in this case—affidavits, mortgage deeds, and even closing statements—were signed simply as "Jeffrey Purcell" or "Jeffrey J. Purcell"—indicating an obvious intent by him to act as an individual as opposed to performing in a corporate capacity. Indeed, Purcell swore that *he, not the corporation,* was the "original contractor" and "general contractor," in the interim and final affidavits, respectively. In addition, the six properties upon which the homes were built were recorded in the names of Jeffrey J. Purcell and his wife, Teresa, and the closing statements indicate that the sellers of those properties were Jeffrey and Teresa Purcell, not Joseph Purcell & Sons, Inc. Finally, Larry Thompson, president of appellant Thompson Electric, testified on direct examination that Jeffrey Purcell was the original contractor.

After reviewing the record, it is manifest that Jeffrey Purcell as an individual, not the corporation, had direct privity of contract with the ultimate homeowners. Therefore, we must hold that the trial court's finding that Joseph Purcell & Sons, Inc. was the original contractor is against the manifest weight of the evidence.

## II

The next issue we must address is whether subcontractors may assert a cause of action against a lending institution under R.C. 1311.011(B)(5). The trial court held that they could, but the court of appeals reversed, holding that the statute applies only to persons having a proprietary interest in the property, such as the ultimate homeowners in the instant case.

The pertinent portion of the statute states:

"* * * The lending institution shall not be financially liable to the owner, part owner, purchaser, lessee, *or any other person* for any payments, except for gross negligence or fraud committed by the lending institution in making any payment to the original contractor." (Emphasis added.)

The question thus becomes: Did the legislature intend for subcontractors to fall within the category of "any other person"? The court of appeals pointed out that the first four terms used to describe the class of individuals to whom the lending institution owes a duty share the common denominator of an ownership interest. Using the statutory construction rule that vague terms should be considered in light of preceding ones, the appellate court

concluded that a lending institution owed no duty to subcontractors. We find this reasoning unpersuasive.

Another line of statutory construction is more appropriate. "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." *Baker* v. *Powhaten Mining Co.* (1946), 146 Ohio St. 600, 33 O.O. 84, 67 N.E. 2d 714, paragraph three of the syllabus. "In determining legislative intent it is the duty of this court to give effect to the words used, *not to delete* words used or to insert words not used." *Columbus-Suburban Coach Lines, Inc.* v. *Pub. Util. Comm.* (1969), 20 Ohio St. 2d 125, 127, 49 O.O. 2d 445, 446, 254 N.E. 2d 8, 9. Finally, as this court succinctly stated in *Iddings* v. *Bd. of Edn. of Jefferson Cty. School Dist.* (1951), 155 Ohio St. 287, 290, 44 O.O. 294, 295, 98 N.E. 2d 827, 829:

"It has been so frequently stated as to become axiomatic that the meaning and intent of a legislative enactment are to be determined primarily from the language itself. The plain provisions of a statute *must control*. If there is no ambiguity therein there is no occasion to construe or interpret. To construe or interpret what is already plain is not interpretation but legislation, which is not the function of courts. When the meaning is plain from the language employed, an attempt to construe it only tends to make ambiguous that which is simple and clear. * * *"

In this case, the meaning of "any other person" is simple and clear. Thus, we hold that this phrase encompasses all subtrades.[1] If the General

Assembly had intended otherwise, it would have used more restrictive language, such as phraseology that protection is limited to "any other person with proprietary or ownership interest." This is precisely the interpretation made by the court of appeals, which is contrary to the rules of construction enunciated above.

We also look at the public policy reasons supporting the position that subcontractors have a cause of action against lending institutions under R.C. 1311.011(B)(5).

In enacting R.C. 1311.011, the legislature severely limited the rights of subtrades. The first three subsections of R.C. 1311.011(B) establish certain duties and limitations on subtrades who work at residential construction sites. R.C. 1311.011(B)(1) extinguishes subtrades' ability to file mechanic's liens after a homeowner has paid the original contractor in full. R.C. 1311.011(B)(2) provides that even if subtrades file mechanic's liens prior to the time a homeowner pays the original contractor in full, the subtrades' claims are secured only to the extent that they do not exceed the amount of the purchase price that has not been paid by the homeowner. And R.C. 1311.011(B)(3) provides that, upon demand of a homeowner, the subtrades are required to release any mechanic's liens they have filed after the homeowner pays the original contractor in full.

The fourth and fifth subsections of R.C. 1311.011(B), on the other hand, address the duties of lending institutions. R.C. 1311.011(B)(4) requires that before closing, a lending institution must obtain an affidavit from the original contractor stating that he has paid in full for all work performed and for all labor, materials, machinery, and fuel furnished at a residential construction site, unless the unpaid bills are specifically identified in the affidavit.

---

[1] The term "subtrades" is used to refer to subcontractors, materialmen, and laborers in general.

R.C. 1311.011(B)(5) provides protection to parties who are injured by a lending institution's gross negligence or fraud.

Since many lien rights of subcontractors were extinguished or diluted under R.C. 1311.011(B)(1), (2), and (3), it is logical to conclude that sections (B)(4) and (5) were enacted, at least in part, to afford some degree of protection to subcontractors. After all, homeowners are fully protected under the first three subsections. Any other result is anomalous. Indeed, it is unlikely that the General Assembly would wish to leave subcontractors, especially those with little or no remedy via mechanic's liens, at the mercy of irresponsible and unscrupulous original contractors and lending institutions.

Therefore, for the foregoing reasons, we hold that a subcontractor is an appropriate party to assert a cause of action against a lending institution under R.C. 1311.011.

### III

Because subcontractors are a class of persons protected under R.C. 1311.011, the final issue we address is whether Bank One acted in a grossly negligent manner in the instant case.

### A

R.C. 1311.011(B)(5) provides lending institutions with a limited degree of immunity from liability for acts or omissions made in financing home purchase contracts. As noted above, this subsection provides that a lending institution shall not be financially liable to any person, including subcontractors, for any payments, "except for gross negligence or fraud committed by the lending institution in making any payment to the original contractor."

While the trial court found no fraud in the instant case, it found that Bank One was grossly negligent in disbursing mortgage loan proceeds to the original contractor. While fraud is a well-defined concept under Ohio law, the same cannot be said of gross negligence. Distelhorst & Marti, *supra,* at 127, Section 9-15.[2] An early Ohio Supreme Court case defined "gross negligence" as the "failure to exercise any or very slight care." *Johnson* v. *State* (1902), 66 Ohio St. 59, 67, 63 N.E. 607, 609. See, also, *Cleveland, C., C. & I. Ry. Co.* v. *Elliott* (1876), 28 Ohio St. 340, 356-357; *Payne* v. *Vance* (1921), 103 Ohio St. 59, 133 N.E. 85. Prosser states that gross negligence "has been described as a failure to exercise even that care which a careless person would use." Prosser & Keeton, Law of Torts (5 Ed. 1984) 212, Section 34.

R.C. 1311.011(B)(5) provides one example of gross negligence: "After receipt of a written notice of a claim of a right to a mechanic's lien by a lending institution, failure of the lending institution to obtain a lien release from the subcontractor, materialman, or laborer who serves notice of such claim is prima-facie evidence of gross negligence."

In light of this example, the question thus becomes whether the legisla-

---

[2] Prosser & Keeton, Law of Torts (5 Ed. 1984) 210-211, Section 34, states:

"Although the idea of 'degrees of negligence' has not been without its advocates, it has been condemned by most writers, and, except in bailment cases, rejected at common law by most courts, as a distinction 'vague and impracticable in [its] nature, so unfounded in principle,' that it adds only difficulty and confusion to the already nebulous and uncertain standards which must be given to the jury.* * *

"Nevertheless, the idea of degrees of negligence * * * has been adopted in a number of judicial opinions and statutes. * * *" (Footnotes omitted.)

ture intended the definition of gross negligence to be narrow, limiting gross negligence exclusively to the factual situation described above, or should a broader treatment of the section be applied, which would include other acts and/or omissions by a lending institution? We believe the latter choice is the better rule, especially when the second paragraph of R.C. 1311.011(B)(5) is read in conjunction with the first paragraph. Since the first paragraph allows the lending institution to rely on the affidavit required by R.C. 1311.011 (B)(4), the second paragraph indicates that the lending institution *cannot* rely on the affidavit after it receives "written notice of a claim of a right to a mechanic's lien." Therefore, reliance on the affidavit after receipt of notice that would belie same would constitute one example of gross negligence. In addition, since receipt of a (B)(4) affidavit is mandatory, as will be discussed *infra,* failure to obtain such an affidavit would also constitute *prima-facie* evidence of gross negligence.

### B

In the case at bar, two different types of affidavits were received by Bank One from Purcell: "interim" affidavits made in connection with periodic disbursements from the construction loans and "final" affidavits made in connection with final disbursements from the purchase money mortgage loans.

### (1)

The interim affidavits, which were executed during construction of all six homes, stated that no liens had been filed against the properties and that all work or materials provided or used in construction had been paid in full. In most of the instances involved here, the bank requested and received such affidavits before disbursing money from Purcell's construction loans. In a few cases, however, the interim affidavits were not obtained by the bank or the affidavits that were obtained were not properly notarized or completed. Appellants argue that because affidavits were not always obtained by the bank when disbursements were made from the construction loans, and because some of these affidavits were not properly notarized or completed, this is evidence of Bank One's gross negligence toward appellants. We disagree.

Appellants suggest that the language of R.C. 1311.011(B)(4), which provides that no lending institution shall make *any* payment to any original contractor until proper affidavits are obtained, required Bank One to obtain affidavits whenever it made disbursements from Purcell's construction loans. To determine whether this is a proper interpretation, we must examine the loan transactions that took place in the instant case and the statutory language applicable to same.

For each of the properties involved here, Bank One executed two separate loan transactions: a construction loan and a purchase money mortgage loan. The construction loans were entered into between the bank and Purcell to finance construction of the homes being built by Purcell. The purchase money mortgage loans were entered into between the bank and the ultimate homeowners to finance the purchase of the completed homes from Purcell. Under these two transactions, the duties owed by lending institutions, and the parties to whom they were owed, are separate and distinct.

R.C. 1311.011(B)(4) applies only to "lending institutions," as that term is defined in R.C. 1311.011(A)(3).[3] As

---

[3] R.C. 1311.011(A)(3) provides:
" 'Lending institution' means any person that enters into a contract with the owner, part owner, purchaser, or lessee to

Distelhorst & Marti, *supra,* points out, this statutory definition sets forth five essential elements. "A lending institution is (1) a person which (2) enters into a contract with an owner, part owner, purchaser, or lessee under a home purchase or construction contract (3) to finance the home purchase or construction contract, and is (4) at least partially secured by a mortgage on the property which is the subject of the home purchase or construction contract and (5) makes direct disbursements to an original contractor, or the owner, part owner, lessee, or purchaser." *Id.* at 115, Section 9-5.

While Bank One is a "lending institution" in the case of the purchase money mortgage loans, the bank does not meet the statutory definition of R.C. 1311.011(A)(3) with respect to the construction loans. Specifically, under the construction loans involved in this case, the bank entered into a contract with Purcell, the general contractor; the bank *did not* enter into a contract with "an owner, part owner, purchaser, or lessee under a home purchase or construction contract," *i.e.,* the ultimate homeowner, as is required by statute. Since this essential element was not met, then it is clear that the other derivative elements required by R.C. 1311.011(A)(3) were not met.

Therefore, Bank One was not a "lending institution" under the construction loans for purposes of R.C. 1311.011. Thus, if the bank owed any duty to subtrades with respect to the construction loans executed in this case, that duty is outside the purview of R.C. 1311.011 and general mechanic's lien law should apply.

R.C. 1311.04 provides that a mortgagee *may* make a written demand for an affidavit upon the original contractor, who is then obligated to provide such affidavit showing the name and address of each subcontractor who has not received payment and stating the amount due. Such a request by a mortgagee is clearly discretionary. As we stated in *Gardner Plumbing, Inc.* v. *Cottrill* (1975), 44 Ohio St. 2d 111, 114, 73 O.O. 2d 390, 392, 338 N.E. 2d 757, 759:

"An examination of the * * * language [of R.C. 1311.04] reveals that no mandatory duty is imposed upon the mortgagee to make a written demand upon the contractor. By making the relevant parts of R.C. 1311.04 applicable to a mortgagee 'whenever any mortgagee makes a written demand,' the General Assembly gave the mortgagee discretionary power to demand affidavits from subcontractors. It follows, however, that it is not imperative that the mortgagee exercise this discretion."

In *Takach* v. *Williams Homes, Inc.* (1983), 6 Ohio St. 3d 357, 6 OBR 411, 453 N.E. 2d 656, this court examined the necessity of obtaining affidavits for disbursements from a construction loan in light of R.C. 1311.011(B)(4). *Takach,* however, involved an action against a lender by homeowners, not subcontractors. In *Takach,* the court stated in the syllabus:

"Pursuant to R.C. 1311.011(B)(4), a lending institution has a statutory duty to require an original contractor to provide affidavits for protection against mechanics' liens prior to the disbursement of any funds to the con-

---

provide financing for a home construction contract or a home purchase contract, which financing is secured, in whole or in part, by a mortgage on the real estate upon which the improvements contemplated by the home construction contract are to be made or upon the property that is the subject of the home purchase contract, and that makes direct disbursements under the contract to any original contractor or the owner, part owner, purchaser, or lessee."

tractor. This duty is owed to one, *having a loan commitment from the same lending institution for the subject home,* who might be damaged by such wrongful disbursement." (Emphasis added.)

Therefore, while a lending institution may owe a duty to a homeowner to obtain affidavits before disbursing funds from a *construction loan,* no such duty extends to subtrades. A lending institution, however, may owe a duty to subtrades to obtain affidavits from an original contractor under a *purchase money mortgage loan* pursuant to R.C. 1311.011, as is discussed *infra.* The *Takach* decision protects the interests of the homeowner under these circumstances. The interests of subtrades were not addressed in *Takach.* Indeed, subtrades need no such protection since they can protect their own interests by filing liens on the property under construction.

Thus, Bank One owed no duty to appellants to obtain interim affidavits from Purcell for disbursements from the construction loans. The fact that the bank did seek these affidavits—even though Purcell lied on them and even though not all the documents were properly executed—does not demonstrate gross negligence. If anything, this action indicates an attempt by the bank to exercise reasonable care.

(2)

The second type of affidavit received by Bank One from Purcell was the final affidavit. Unlike R.C. 1311.04, which merely authorizes a lending institution to obtain an affidavit, R.C. 1311.011(B)(4) mandates that a lending institution obtain an affidavit from the original contractor before any payment is made under a home purchase contract. This affidavit must state that the original contractor

has paid for all work or materials provided by the subtrades in the home construction "prior to the date of the closing of the purchase or during and prior to the payment period," except for unpaid claims specifically set out in the affidavit.

Of the five final affidavits provided by Purcell, three of them—covering the Holmgren, Fink, and Cervenak properties—were received by Bank One before it disbursed proceeds from the purchase money mortgage loans. Thus, the requirements of R.C. 1311.011(B)(4) were met.

In two other situations—involving the Labajetta and Forkin properties—the bank disbursed the proceeds after oral representations by Purcell that all work and materials had been paid for but before he signed final affidavits to that effect. Purcell signed the final affidavits approximately one week after the oral representations. The bank closed on these properties before receipt of the final affidavits at the insistence of the ultimate homeowners who were apparently anxious to take possession of the properties in their own names. While we recognize that Bank One did not act in precise compliance with the statutory language of R.C. 1311.011(B)(4), we cannot find that the bank acted in a grossly negligent manner, as that term is defined *supra.*

The last of the six homes, the DiFrancesco property, was closed on April 26, 1984. At the time of the closing, the bank paid off the construction loan out of the purchase money mortgage loan but did not disburse any additional funds to Purcell personally. Because no funds were paid to Purcell, Bank One did not obtain a final affidavit from him. Bank One officials testified that they held the remaining funds—apparently for payment to unpaid subtrades. Appellants, however,

did not notify the bank of their claims or make any attempt to reach these funds despite the fact that the funds were available up to and during the trial. The bank's actions appear to be reasonable under the circumstances. At the very least, it cannot be said that such actions rise to a level of gross negligence.

(3)

Appellants also argue that the five final affidavits obtained by the bank were improper in three other ways and thus constitute gross negligence.

First, appellants contend that the affidavits were not made by the proper party. As discussed in the first section of this opinion, Jeffrey Purcell, not Joseph Purcell & Sons, Inc., was the original contractor and proper affiant.

Second, appellants contend the language of the affidavits does not meet the criteria set forth in R.C. 1311.011(B)(4)(a) and (b).[4] Appellants' main contention is that a phrase in the affidavit stating that "all bills for labor and material going into said construction have been paid in full" does not adequately reflect the requirements of the statute, which provides that the affidavit must state that "the original contractor has paid in full for all work performed and for all labor, materials, machinery, or fuel furnished * * *." By stating that all bills had been paid, Purcell was stating that there were no unpaid claims. This is a distinction without a difference. Therefore, Purcell's affidavits substantially complied with the statutory language of R.C. 1311.011(B)(4)(a) and (b).

Finally, appellants contend that because work on the homes was not complete when the final affidavits were executed, this is evidence of gross negligence. Except for the DiFrancesco home, the homes were

_____

[4] The final affidavit—before it was filled out, executed, and notarized—provided:

*"AFFIDAVIT*

["]STATE OF OHIO　　)

　　　　　　　　　)ss

["]SUMMIT COUNTY　)

["]_____, being first duly sworn, deposes and says that _____ is the general contractor for the construction of a certain dwelling house and garage for _____ on premises known as Sublot No. _____, and being also known as house number _____ on _____ Street; that said construction has been fully completed to the satisfaction of the owner and in accordance with contract, plans, and specifications, and that all bills for labor and material going into said construction have been paid in full.

["]Affiant further says that in consideration of the payment of the sum of $_____ remaining due upon the contract heretofore entered into between _____ for the aforesaid construction, the undersigned does for _____ self, _____ successors and assigns, hereby waive any and all lien rights which _____ might have against the aforesaid premises.

["]Affiant further says that ____ will indemnify and protect the owners and the mortgagee against any and all claims or obligations which may arise in connection with the above construction contract.

["]_____

["]SWORN TO before me and subscribed in my presence this _____ day of _____, 19____.

["]_____
　　NOTARY PUBLIC['] "

substantially completed when the properties closed. This is not unusual in the construction business. Properties are often closed before the homes are completed, especially when weather does not permit outside activities, such as landscaping, painting, grading, or concrete work. Indeed, all the purchase contracts in this case contained a "pre-completion closing" clause, which stated that properties could close before completion.[5] There is simply no showing of evidence demonstrating gross negligence in this record.

## IV

As a matter of law, the trial court did not find that Bank One committed fraud, but held that the bank was grossly negligent in disbursing proceeds from the purchase loans. Appellants made much of the fact that the bank loaned Purcell or his corporation $140,000 to pay off creditors during construction of the homes. But this loan was extended only after it was made clear to Purcell that the money was to be used to pay off past construction debts. No evidence was offered to prove that Bank One believed otherwise. In addition, no evidence was offered by appellants to prove that the bank knew the final affidavits provided by Purcell were untrue. Indeed, Bank One officials maintained that they relied on Purcell's representations in disbursing funds from the purchase loans.

The ultimate issue in this case is who should bear responsibility for the unpaid plumbing and electrical bills. Appellants argue that such responsibility should fall on Bank One, but we question whether such an argument would be necessary if appellants themselves had acted prudently. Despite the fact that appellants knew Purcell was dilatory in paying for their services, they did not file mechanic's liens on the properties, they did not serve written notice on Bank One of their claims to a right to mechanic's liens, or even verbally notify the bank of the financial problems they had encountered with Purcell until after the final affidavits had been executed and disbursements had been made. If, on the other hand, appellants had put Bank One on notice of their claims before the bank received the final affidavits, and the bank had ignored these claims, this would have been *prima-facie* evidence of gross negligence under R.C. 1311.011(B)(5).[6] Obviously, this did not occur in the instant case.

For the foregoing reasons, we find that the trial court erred in finding as a matter of law that Bank One was

---

[5] The clause stated:

"14.0 PRE-COMPLETION CLOSING. In the event that weather conditions are such that the structure cannot be completed, including such items as exterior concrete, driveways, exterior paint or final grading, and provided that the structure is habitable and temporary access is provided, the parties agree that closing will be consummated and upon request of the Buyer, an amount equal to the cost of these items will be withheld at the time of closing. Seller agrees to complete these items as soon as suitable weather permits and Buyer agrees that the satisfactory completion of these items shall be determined solely by the escrow agent at the time of such completion."

[6] We also find it curious that appellants did not sue Jeffrey Purcell, the party with whom they contracted and the one who failed to pay for their services. Indeed, appellants testified that they continued to work with Purcell after encountering the financial problems that became the genesis of this lawsuit.

grossly negligent. The bank's actions in this case constitute, if anything, ordinary negligence. We do not find that these actions rise to a level of gross negligence as defined under Ohio law. Therefore, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., LOCHER, HOLMES and BRYANT, JJ., concur.

SWEENEY, J., concurs in paragraph one of the syllabus only.

DOUGLAS, J., concurs in judgment.

PEGGY BRYANT, J., of the Tenth Appellate District, sitting for H. BROWN, J.

DOUGLAS, J., concurring. I concur in the judgment. The next to last paragraph of the majority opinion sets forth the issue and the answer to the issue presented by this case. Much of the other material contained in the opinion is interesting and, even, in some respects accurate but is, for the most part, unnecessary to the resolution of the issue presented. While I disagree with some of the specific findings of the opinion I, nevertheless, concur in the judgment.