WOOTEN et al. Appellants,

v.

REPUBLIC SAVINGS BANK, Appellee,

[Cite as *Wooten v. Republic Sav. Bank*, 172 Ohio App.3d 722, 2007-Ohio-3804.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 06–CA–24.

Decided July 27, 2007.

Ray A. Cox, for appellants.

Kirk W. Liederbach, for appellee.

BROGAN, Judge.

{¶ 1} Thomas and Amy Wooten appeal from the judgment of the Champaign County Court of Common Pleas granting summary judgment in favor of Republic Savings Bank.

{¶ 2} On May 22, 1998, the Wootens obtained a convertible construction loan from Republic Savings Bank to build a new house in Champaign County, Ohio. The loan was secured by a mortgage on the real property owned by the Wootens and located at 12233 State Rte. 55, Paris, Ohio. The home was to be constructed on this site by the original contractor, Southwest Builders, Inc. ("Southwest") for $129,220.

{¶ 3} Also on May 22, 1998, the bank paid the first draw in the amount of $6,400 to Southwest pursuant to a settlement statement signed by the Wootens on May 22, 1998. Before disbursing the first draw to Southwest, however, the bank had not received an original contractor affidavit as required by R.C. 1311.011(B)(4). This section of the Revised Code provides that "[n]o lending institution shall make any payment to any original contractor until the original contractor has given the lending institution the original contractor's affidavit stating:

{¶ 4} "(a) That the original contractor has paid in full for all labor and work performed and for all materials furnished by the original contractor and all subcontractors, material suppliers, and laborers prior to the date of the closing of the purchase or during and prior to the payment period, except such unpaid claims as the original contractor specifically sets forth and identifies both by claimant and by amount claimed;

{¶ 5} "(b) That no claims exist other than those claims set forth and identified in the affidavit required by division (B)(4) of this section."

{¶ 6} On June 6, 1998, the Wootens authorized a second draw in the amount of $18,423 to be paid to Southwest. The bank received the progress draw-release authorization signed by the Wootens on the same day. Furthermore, Southwest

submitted an original contractor's affidavit pursuant to R.C. 1311.011(B)(4) in conjunction with this draw-release request.

{¶ 7} On June 13, 1998, an officer and builder of Southwest, Mr. Gasaway, died. The Wootens were in contact with Southwest several days following Mr. Gasaway's death, at which time they were informed that construction would be delayed for two to three months. Southwest performed no further work on the Wootens' property.[1]

{¶ 8} On June 24, 1998, the bank paid the second draw in the amount of $10,700 to Southwest. The bank made no subsequent draw payments on the Wootens' construction loan to Southwest after this June 24, 1998 disbursement.

{¶ 9} Early in July 1998, the Wootens met with the bank's agent, Craig R. Johnson, to discuss the status of their construction loan account following the death of Mr. Gasaway. Johnson told the Wootens that they could continue to build, acting as their own contractors; they could find another contractor; or they could continue with Lou Gasaway, Mr. Gasaway's wife, as builder/contractor for Southwest. Moreover, in response to a question regarding the Wootens' authorization for payment from the second draw, Johnson stated that all assets of Southwest were frozen. The Wootens eventually decided to act as their own contractors and continue building.

{¶ 10} Subsequent to their meeting with Johnson, the Wootens received a receipt from the bank indicating that Southwest had been paid from the second draw on June 24, 1998. Consequently, they contacted the bank by telephone to discuss that payment. The Wootens spoke to the bank's representative, Mr. Hyland, who informed them that they should seek advice from an attorney. It wasn't until the following year that they sought the legal advice of attorney Anthony Kohler. On April 9, 1999, Kohler sent a letter to Mr. Hyland regarding a March 23, 1999 conversation in which they discussed claims against Southwest directly involving the bank. Mr. Wooten testified in a deposition that he had met with Kohler prior to April 9, 1999, concerning the dispute with the bank.

{¶ 11} Four mechanics' liens were placed on the Wootens' property by materialmen and subcontractors. First, Julie Schwartz, d.b.a. C.E. Ment, filed a mechanics' lien on July 17, 1998, for materials and labor provided between June 1 and June 3, 1998, in the amount of $2,308.66. The Wootens received a copy of the lien on July 17, 1998. They also received a letter from the company in January 1999, indicating that a lien had been placed on the property. Following receipt of the letter, the Wootens contacted the lienholder. Next, Ernst Enterprises recorded its lien on July 28, 1998. The lien stated that it covered materials

---

1. Southwest eventually filed for bankruptcy on September 2, 1998. The Wootens were listed as creditors.

furnished on June 2, 1998, in the amount of $995.46. The Wootens received a copy of this lien on July 28, 1998. They also discussed the lien with the company's secretary. Third, Bryce Hill, Inc., recorded a lien on the property on August 14, 1998. The lien indicated that it was for labor and materials provided between June 2 and June 3, 1998, in the amount of $1,162.77. The Wootens received their copy of the lien on August 14, 1998. Finally, Easter Masonry & Construction Company recorded its lien on August 14, 1998. The lien stated that the last date the company furnished materials and labor was June 20, 1998, in the amount of $1,725. The Wootens received a copy of this lien on August 14, 1998. They also discussed the lien with a representative from the company following receipt of their copy. In total, the Wootens paid $6,191.89 to release all of the mechanics' liens from their property.

{¶ 12} The Wootens filed a complaint against the bank on May 19, 2003, including causes of action for negligence, gross negligence, unjust enrichment, breach of obligations of good faith and fair dealing, breach of contract, breach of implied contract, promissory estoppel, fraud, and constructive fraud. The Wootens claimed that subsequent to the death of Mr. Gasaway and the bankruptcy of Southwest Builders, Inc., and after being advised that their construction loan account with Southwest was "frozen," the bank paid Southwest $10,700 from the Wootens' account.[2] Specifically, the Wootens alleged that the bank failed to control payment of the construction phase and assure that subcontractors and material suppliers were paid for labor and material. Furthermore, they argued that the bank's agent, Craig Johnson, made a fraudulent representation that Southwest's assets were frozen following the death of Mr. Gasaway and that the bank would not pay draws without assuring potential lienholders were paid. As part of this fraud, the Wootens contend that the bank negligently disbursed $10,700 from the second draw to Southwest. According to the Wootens, the earliest date at which they discovered or should have discovered the alleged fraud of the bank was December 2002. At that time, they received a letter from the Federal Deposit Insurance Corporation acknowledging the receipt of their complaint against the bank and indicating that the bank was pursuing internal discovery and a proposed resolution of the matter.

{¶ 13} Both parties filed a motion for summary judgment. On June 30, 2006, the trial court granted the bank's motion. It is from this decision that the present appeal comes.

---

2. As noted earlier, Southwest filed for bankruptcy on September 2, 1998. The amount in dispute from the second draw, $10,700, was paid to Southwest on June 24, 1998. Furthermore, the Wootens met with the bank's representative, Craig Johnson, in early July of 1998. Thus, the Wootens' claim that the bank paid $10,700 from their account *subsequent* to their meeting with Johnson and to the bankruptcy of Southwest is incorrect.

{¶ 14} As an appellate court, our review of trial court decisions on summary judgment is de novo, which means that "we apply the standards used by the trial court." *Brinkman v. Doughty* (2000), 140 Ohio App.3d 494, 497, 748 N.E.2d 116. Trial courts will appropriately grant summary judgment when they find "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 15} Upon review of the record, we find that the Wootens' assignments of error are without merit. Accordingly, the judgment of the trial court is affirmed.

I

{¶ 16} To facilitate our discussion of this matter, we will address the Wootens' assignments of error out of order.

{¶ 17} Under their second assignment of error, the Wootens contend that the trial court erred in holding that statutory immunity from liability for all claims except gross negligence and fraud is not dependant upon compliance with the affidavit procedure in R.C. 1311.011(B)(4). Specifically, the Wootens argue that the trial court misinterpreted the Ohio Supreme Court's decision in *Thompson Elec., Inc. v. Bank One, Akron, N.A.* (1988), 37 Ohio St.3d 259, 525 N.E.2d 761, when it found that R.C. 1311.011(B)(5) grants immunity to lending institutions for all claims except gross negligence and fraud who fail to obtain original contractors' affidavits before disbursing payments pursuant to R.C. 1311.011(B)(4).

{¶ 18} R.C. 1311.011(B)(4) provides that "[n]o lending institution shall make any payment to any original contractor until the original contractor has given the lending institution the original contractor's affidavit stating:

{¶ 19} "(a) That the original contractor has paid in full for all labor and work performed and for all materials furnished by the original contractor and all subcontractors, material suppliers, and laborers prior to the date of the closing of the purchase or during and prior to the payment period, except such unpaid claims as the original contractor specifically sets forth and identifies both by claimant and by amount claimed;

{¶ 20} "(b) That no claims exist other than those claims set forth and identified in the affidavit required by division (B)(4) of this section."

{¶ 21} Furthermore, R.C. 1311.011(B)(5) provides that "[w]hen making any payment under the home construction contract or on behalf of the owner or part

owner under a home purchase contract, the lending institution may accept the affidavit of the original contractor required by division (B)(4) of this section and act in reliance upon it, unless it appears to be fraudulent on its face. *The lending institution is not financially liable to the owner, part owner, purchaser, lessee, or any other person for any payments, except for gross negligence or fraud committed by the lending institution in making payment to the original contractor.*" (Emphasis added.)

{¶ 22} Here, the bank paid the first draw to Southwest in the amount of $6,400 on May 22, 1998, without first obtaining a contractor affidavit per R.C. 1311.011(B)(4). The trial court relied on the emphasized portion of R.C. 1311.011(B)(5) to find that the bank was immunized from liability for all claims against it except those of gross negligence and fraud that arose from its May 22, 1998 payment. Although we believe the trial court misinterpreted *Thompson Elec., Inc.* as not mandating the affidavit procedure in R.C. 1311.011(B)(4) in the present matter, we do not find that the facts of this case demonstrate any harm to the Wootens as a result of the bank's conduct.

{¶ 23} The Ohio Supreme Court decided *Thompson Elec., Inc.* in the context of whether lending institutions owe a duty to a subcontractor to obtain affidavits under R.C. 1311.011(B)(4) before disbursing funds from a construction loan. There, the court held that lending institutions owe a duty to subtrades to obtain contractor affidavits under a purchase money mortgage, but this duty does not extend to subtrades before disbursing payments from a construction loan. Id., 37 Ohio St.3d at 268, 525 N.E.2d 761. According to the court, subcontractors do not need the protection of R.C. 1311.011(B)(4) in such circumstances because "they can protect their own interests by filing liens on the property under construction." Id. The court, however, expressly distinguished the facts in its decision from those in *Takach v. Williams Homes, Inc.* (1983), 6 Ohio St.3d 357, 6 OBR 411, 453 N.E.2d 656, a case in which an action founded on compliance with R.C. 1311.011(B)(4) was brought by a *homeowner* against a lending institution. (Emphasis added.) Id. at 267, 525 N.E.2d 761.

{¶ 24} In *Takach,* the court held that lending institutions have a statutory duty to homeowners not to make any payments to the original contractor until the contractor has given the lending institution the required affidavits. 6 Ohio St.3d at 360, 6 OBR 411, 453 N.E.2d 656. According to the court, this duty is owed to one, having a loan commitment from the same lending institution for the subject home, who may be damaged by a wrongful disbursement. Id.

{¶ 25} *Blanchester Lumber & Supply, Inc. v. Cardinal State Bank* (1988), 56 Ohio App.3d 25, 564 N.E.2d 1074, supports *Takach.* In *Blanchester Lumber & Supply Inc.,* the court found that R.C. 1311.011(B)(5) builds upon R.C. 1311.011(B)(4), where the purpose of the statute is to insulate a lending institu-

tion from liability when it relies on what it reasonably believes to be a complete and truthful disclosure of the original contractor's expenses in an R.C. 1311.011(B)(4) affidavit. Id. at 28, 564 N.E.2d 1074.

{¶ 26} In this case, the first draw was paid to Southwest in the amount of $6,400 on May 22, 1998, pursuant to the Wootens' authorization of the settlement statement. The bank paid this draw without obtaining a contractor affidavit, and thus, was in violation of its statutory duty under R.C. 1311.011(B)(4). See *Takach*, supra. At that time, however, the settlement statement did not indicate that any work had been performed on the property or that any supplies had been delivered. The bank claims that the progress inspection in conjunction with the loan closing statement further demonstrates that no work had been completed or materials delivered as of May 22, 1998. This fact is not disputed by the Wootens.

{¶ 27} Furthermore, with the exception of Easter Masonry's lien filed on August 14, 1998, all liens attached to the property between July and August 1998 provided that they covered labor and materials after May 22, 1998. Easter Masonry's lien states that it was for materials and labor furnished prior to June 20, 1998, in the amount of $1725. In light of the settlement statement and progress report, it may reasonably be inferred that Easter Masonry provided its materials and labor subsequent to the first draw payment on May 22, 1998.

{¶ 28} Finally, we note that the complaint alleges that two draws were made on or about June 5, 1998. The Wootens argue that these draws were not used to pay materialmen, amounting in costs of $6,191.89 to pay for the release of the mechanics' liens. They also claim that the draws resulted in the improper payment of $10,700 after the death of the original contractor and the advice from the bank that Southwest's account was frozen. It is apparent from the complaint that the bank's failure to obtain a contractor's affidavit with the first draw payment on May 22, 1998, did not result in any of the damages the Wootens are seeking.

{¶ 29} Thus, we find no merit in any of the claims the Wootens have alleged against the bank regarding improper disbursement of funds from the first draw on May 22, 1998. Although the trial court misinterpreted *Thompson Elec., Inc.* in holding that R.C. 1311.011(B)(4) does not require a lending institution to obtain a contractor's affidavit prior to disbursing a homeowner's funds on a construction loan, the record fails to demonstrate how the Wootens were damaged by the bank's disbursement. An appellate court "must affirm a judgment of the trial court if it reached the right conclusion, even if the determination was made through invalid reasoning." *McCormick v. Haley* (1973), 37 Ohio App.2d 73, 77, 66 O.O.2d 132, 307 N.E.2d 34. See also *Jurkiewicz v. Butler Cty. Bd. of Elections* (1993), 85 Ohio App.3d 503, 506, 620 N.E.2d 146 (holding that a lower court can reach the correct conclusion for the wrong reasons). Accordingly, we

find that the trial court did not err in holding that the bank is immune from liability for all claims concerning its disbursement of $6,400 from the first draw of the Wootens' account without a contractor's affidavit. Appellants' second assignment of error is overruled.

## II

{¶ 30} In their third assignment of error, the Wootens argue that the trial court erred in finding that the discovery rule (which provides that a cause of action accrues, for purposes of the governing statute of limitations, at the time when the plaintiff discovers the harm) does not apply to their gross-negligence claim. The Wootens specifically contend that the court incorrectly found R.C. 2305.09 to be the applicable statute of limitations for claims of gross negligence. They also assert that the trial court erroneously relied on the Ohio Supreme Court's opinion in *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206, to conclude that the "discovery rule" does not apply to their gross-negligence claim.

{¶ 31} The complaint alleges that the bank's payment of $6,400 from the first draw on May 22, 1998, without first obtaining an original contractor's affidavit and payment of $10,700 from the second draw on June 24, 1998, amounted to gross negligence. Generally, the Wootens claim that the bank failed to properly assure that Southwest had paid for all labor and materials before disbursing funds to Southwest from the construction loan account. The trial court applied the four-year limitations period under R.C. 2305.09 to conclude that the Wootens' gross-negligence claim was time barred, where June 24, 1998, was the latest date involving the bank's allegedly improper conduct, and May 19, 2003, was the date the Wootens filed their complaint. Furthermore, the court found that the "discovery rule" did not apply to claims in negligence governed by R.C. 2305.09. For the following reasons, we agree.

{¶ 32} R.C. 2305.09 provides that "[a]n action for any of the following causes shall be brought within four years after the cause thereof accrued:

{¶ 33} "(A) For trespassing upon real property;

{¶ 34} "(B) For the recovery of personal property, or for taking or detaining it;

{¶ 35} "(C) For relief on the ground of fraud;

{¶ 36} "(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code;

{¶ 37} "(E) For relief on the grounds of a physical or regulatory taking of real property.

{¶ 38} "If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered."

{¶ 39} In *Investors REIT One,* the Ohio Supreme Court stated that "R.C. 2305.09 provides a general limitations period of four years for tort actions not specifically covered by other sections of the Ohio Revised Code. See *Mahalsky v. Salem Tool Co.* (C.A.6, 1972), 461 F.2d 581, 585. General tort claims, including those for negligence, are governed by R.C. 2305.09(D)." Id. at 179, 546 N.E.2d 206, citing *Richard v. Staehle* (1980), 70 Ohio App.2d 93, 24 O.O.3d 121, 434 N.E.2d 1379. Moreover, the court found that the "discovery rule" is not available to negligence claims brought under R.C. 2305.09(D), where "[t]he legislature's express inclusion of a discovery rule for certain torts * * *, including fraud and conversion, implies the exclusion of other torts arising under the statute, including negligence." Id. at 181, 546 N.E.2d 206.

{¶ 40} Here, the Wootens' gross-negligence claim is governed by R.C. 2305.09(D). It is a general tort action not specifically covered by other sections of the Ohio Revised Code. See *Investors REIT One,* supra. Inasmuch as the Wootens imply that the distinction between general negligence and gross negligence precludes the four-year statute of limitations from controlling their claim, we find the argument to be without merit. The alleged grossly negligent conduct is the bank's payment of $6,400 from the first draw on May 22, 1998, and its payment of $10,700 from the second draw on June 24, 1998. The Wootens' complaint was filed on May 19, 2003, approximately five years after the alleged conduct took place. As the "discovery rule" is not available to negligence claims brought under R.C. 2305.09, we hold that the trial court did not err in holding that the Wootens' claim of gross negligence is barred by this four-year statute of limitations. Accordingly, the third assignment of error is overruled.

{¶ 41} We note that the Wootens argued in their appellate brief that R.C. 2305.10 is the correct section governing the statute of limitations for their gross-negligence claim. This argument is without merit, as it was first made on appeal, and R.C. 2305.10 covers claims for product liability, personal injury, and injury to personal property. Furthermore, R.C. 2305.10 has its own limited discovery rule that focuses on claims of bodily injury caused by exposure to asbestos or chromium; claims of bodily injury, when the claimed injury does not manifest itself immediately; and claims of bodily injury caused by exposure to specified chemicals or drugs. *Investors REIT One,* 46 Ohio St.3d at 181, 546 N.E.2d 206.

III

{¶ 42} Under their fourth assignment of error, the Wootens contend that the trial court erred in holding that they discovered or should have discovered the

bank's alleged fraud prior to May 19, 1999. According to the Wootens, the issue of "discovery" is solely a question of material fact for a jury. In support of this argument, the Wootens cite *Bossey v. Al Castrucci, Inc.* (1995), 105 Ohio App.3d 666, 664 N.E.2d 1301.

{¶ 43} First, the parties and the trial court do not disagree that the statute of limitations for fraud claims is four years pursuant to R.C. 2305.09(C), and that "[t]he limitations period begins to run when the claimant discovered or, in the exercise of reasonable care, should have discovered the fraud." *Bossey,* 105 Ohio App.3d at 669, 664 N.E.2d 1301.

{¶ 44} Next, in *Bossey,* this court determined that reasonable minds could differ on the question of when an appellant discovered the fraud on the part of a car dealership. Id. at 669, 664 N.E.2d 1301. There, the appellant claimed he first discovered that the automobile sold to him by the dealership had been involved in an accident when he was told by a former employee of the dealership in August 1993. Id. In contrast, the dealership argued that the appellant discovered the fraud in June 1989, when he was told by technicians at a car stereo service that they suspected that the car had previously been damaged. Id. Applying the standard for review upon a motion for summary judgment, this court held that reasonable minds could differ on the question of "discovery." Id. As a result, a genuine issue of material fact remained for determination by the trier of fact. Id.

{¶ 45} Based on their interpretation of *Bossey,* the Wootens are asking this court to override the summary-judgment standard and make every factual question that may arise in a particular case one solely for a jury to determine. We disagree. Instead, we believe it is fundamental to follow the proper standard of review: Summary judgment is appropriately granted when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. See *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46. See also *Bossey,* 105 Ohio App.3d at 669, 664 N.E.2d 1301.

{¶ 46} Thus, this court's inquiry becomes whether a genuine issue of material fact exists as to when the Wootens reasonably should have discovered the alleged fraud or were put on sufficient notice of the fraud that would lead a reasonable person to immediately begin an investigation. *Doyle v. Ohio Co.* (Sept. 9, 1994), Clark App. No. 94-CA-16, 1994 WL 484205. " 'No more than a reasonable opportunity to discover the misrepresentation is required to start the period of limitations. Information sufficient to alert a reasonable person to the

possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence.'" *Snell v. Salem Ave. Assoc.* (1996), 111 Ohio App.3d 23, 42, 675 N.E.2d 555, quoting *Craggett v. Adell Ins. Agency* (1993), 92 Ohio App.3d 443, 454, 635 N.E.2d 1326.

{¶ 47} Here, the fraudulent conduct alleged by the complaint is Craig Johnson's representation that the Wootens' construction account with Southwest would be frozen after the death of Mr. Gasaway. The Wootens argue that in spite of this representation, the bank paid $10,700 to Southwest from the second draw on June 24, 1998. According to the Wootens, they did not become aware of the bank's allegedly fraudulent conduct until they were notified by the FDIC in December 2002. In contrast, the record indicates that the Wootens received a receipt for the second draw payment in the amount of $10,700 shortly after their July 1998 meeting with the bank's agent, Johnson. They also received copies of the mechanics' liens on their property between July and August 1998. Moreover, the Wootens sought the legal advice of attorney Anthony Kohler, who sent a letter to Mr. Hyland of Appellee Republic Savings Bank on April 9, 1999, regarding a prior conversation in which they discussed claims against Southwest directly involving the bank. Mr. Wooten testified that he had met with Kohler prior to April 9, 1999, concerning the dispute with the bank.

{¶ 48} The trial court found that reasonable minds could come to but one conclusion—the Wootens should have discovered the fraud prior to May 19, 1999. We agree. We find that the Wootens had a duty of inquiry when they received a receipt for the second draw payment in the amount of $10,700 early in July 1998 and notice of the mechanics' liens attached to their property, as these events constituted reasonable opportunities to discover the misrepresentation. Thus, we find that the trial court did not err in holding that the Wootens discovered or should have discovered the bank's alleged fraud prior to May 19, 1999. The fourth assignment of error is overruled.

## V

{¶ 49} Finally, the first and fifth assignments of error are combined for discussion because the Wootens essentially argue that should this court find that the court below erred in granting summary judgment in favor of the bank, genuine issues of material fact still exist. Therefore, the trial court erred in holding that the Wootens' motion for summary judgment was moot. Under these assignments of error, the Wootens claim that the following ten questions of fact remain unresolved:

{¶ 50} "1. When did Wooten discover the fraudulent activities of Bank?

{¶ 51} "2. Did Bank make distribution to the contractor contrary to Ohio law?

{¶ 52} "3. Did Bank charge Wooten's account for distribution to the contractor after the death of contractor and after Wooten had been advised of the death and that the account was frozen? Was that act fraudulent or negligent?

{¶ 53} "4. Did Wooten suffer damages, and if so, how much?

{¶ 54} "5. Did Bank have a fiduciary duty to Wooten and if so, was that fiduciary duty violated?

{¶ 55} "6. Is Bank estopped from raising defenses to fraud because of its violation of higher law, and its promises to Wooten (i.e. promissory estoppel)?

{¶ 56} "7. Did Bank commit fraud or constructive fraud?

{¶ 57} "8. Did Bank violate and breach a lending contract with Wooten?

{¶ 58} "9. Was Bank unjustly enriched by its actions herein?

{¶ 59} "10. Did Bank breach its obligation of good faith and fair dealing pursuant to § 1301.09 O.R.C.?"

{¶ 60} In the alternative, the Wootens contend that a determination that the bank was not immunized from liability for all claims supports a finding of summary judgment in their favor.

{¶ 61} Upon review, we find that the questions of fact, in addition to the questions of law, that the Wootens assert remain unresolved have been answered and/or rendered moot by our disposition of the present matter. The record on appeal demonstrates that there are no genuine issues of material fact and that the bank is entitled to judgment as a matter of law. Civ.R. 56(C). Accordingly, the Wootens' first and fifth assignments of error are overruled.

{¶ 62} For the foregoing reasons, appellants' assignments of error are overruled. The judgment of the trial court is affirmed.

Judgment affirmed.

FAIN and DONOVAN, JJ., concur.