**IRON WORKERS LOCAL UNION NO. 17 INSURANCE FUND and its Trustees, et al., Plaintiffs,**

v.

**PHILIP MORRIS INCORPORATED, et al., Defendants.**

**No. 1:97–CV–1422.**

United States District Court, N.D. Ohio, Eastern Division.

Sept. 10, 1998.

As Amended Sept. 21, 1998.

Eben O. McNair, Timothy Joseph Gallagher, Schwarzwald & Rock, Cleveland, OH, Jack Landskroner, Landskroner Law Firm, Cleveland, OH, John M. Broaddus, Robert J. Connerton, Connerton, Ray & Simon, Washington, DC, Michael C. Spencer, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, Patrick J. Coughlin, Frank J. Janecek, Jr., Scott H. Saham, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Lembhard G. Howell, Richard G. Piccioni, C. Cleveland Stockmeyer, Michael E. Withey, Paul L. Stritmatter, Philip G. Arnold, Kevin Coluccio, Keith L. Kessler, J. Murray Kleist, Stritmatter, Kessler, Whelan & Withey, Seattle, WA, George Kargianis, Kargianis, Watkins, Marler, Seattle, WA, Roger M. Adelman, Washington, DC, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, Einer R. Elhauge, Harvard Law School, Cambridge, MA, for Local 17 Intl Assoc of Bridge, & Iron Workers Insurance Fund, Local 38 International Brotherhood of Electrical Workers, Ohio Laborers Insurance Fund, Dealers–Unions Insurance Fund, Philip M. Zannella, Jr., Gary S. Adams and Mark A. Frey, Local 47 Welfare Fund No. 1, Michael P. Murphy, Mark Davis, Dennis Dingow, Cheryl DeLauer, Martin Presser, Fred A. Scharler, Robert Pfhal and Richard Green, Toledo Electrical Welfare Fund, Todd Michaelson, Dennis C. Duffey, Jerry R. Port-

er, Thomas J. Sigurdson, Gerald W. Hasley, Robert Colgan, Jr., James J. Kozlowski and Patrick J. Jones.

Lawrence R. Desideri, Thomas J. Frederick, Dan K. Webb, Kevin J. Narko, Winston & Strawn, Chicago, IL, Hugh E. McKay, Robert D. Anderle, Porter, Wright, Morris & Arthur, Cleveland, OH, for Philip Morris, Inc.

Roger Allen Hipp, Jones, Day, Reavis & Pogue, Cleveland, OH, Matthew A. Kairis, Jeffrey J. Jones, Melanie S. Fahey, Jones, Day, Reavis & Pogue, Columbus, OH, Daniel F. Kolb, Davis, Polk & Wardwell, New York, NY, for RJR Nabisco, Inc., Nabisco Holdings Corp. and R.J. Reynolds Tobacco Co.

Phillip J. Campanella, Calfee, Halter & Griswold, Cleveland, OH, Kenneth N. Bass, Paul Taylor, Kirkland & Ellis, Washington, DC, for Brown & Williamson Tobacco Corp. and American Tobacco Co.

John Winship Read, Amanda Martinsek, Vorys, Sater, Seymour & Pease, Cleveland, OH, for British American Tobacco Co.

Percy Squire, Thomas D. Lambros, Lloyd Pierre–Louis, Bricker & Eckler, Columbus, OH, Mark G. Cunha, Patrick D. Bonner, Jr., Randall Rainer, Simpson, Thacher & Bartlett, New York, NY, for B.A.T. Industries P.L.C.

Craig E. Gustafson, William J. Crampton, Bruce R. Tepekian, Shook, Hardy & Bacon, Kansas City, MO, Samuel R. Martillotta, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, Patrick M. McLaughlin, John F. McCaffrey, McLaughlin & Caffrey, Cleveland, OH, for Lorillard Tobacco Co.

Thomas P. Meaney, Jr., Kenneth J. Walsh, Tyler Lee Mathews, McDonald, Hopkins, Burke & Haber, Cleveland, OH, Marc E. Kasowitz, Marie V. Santacroce, Michael M.

Fay, Julie R. Fischer, Marie V. Santocroce, Kasowitz, Benson, Torres & Friedman, New York, NY, for Liggett Group, Inc.

Steven D. Bell, Ulmer & Berne, Cleveland, OH, for U.S. Tobacco Sales and Marketing Co.

David J. Hooker, Thomas J. Collin, Robert Francis Ware, Jr., Thompson, Hine & Flory, Cleveland, OH, Steven Klugman, Harry Zirlin, Anne E. Cohen, Debevoise & Plimpton, New York, NY, for Tobacco Research U.S.A., Inc.

Charna E. Sherman, David J. Michalski, James M. Drozdowski, Kathleen Balthrop Havener, Hahn, Loeser & Parks, Cleveland, OH, for Tobacco Institute, Inc.

Susan V. Belanger, Arter & Hadden, Cleveland, OH, John P. Gartland, Arter & Hadden, Columbus, OH, Michael C. Lasky, Davis & Gilbert, New York, NY, Hill & Knowlton, Inc., pro se, for Hill & Knowlton, Inc.

Timothy D. Johnson, Forrest A. Norman, III, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Smokeless Tobacco Council, Inc.

## OPINION AND ORDER

GWIN, District Judge.

On January 8, 1998, defendants[1] moved this Court to dismiss plaintiffs' First Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) [Doc. 27].[2] In ruling on defendants' motion to dismiss for failure to state a claim upon which relief can be granted, the Court first examines defendants' general defense that plaintiffs' claims are too remote to allow recovery. To decide this, the Court reviews the principles underlying the remoteness

---

1. The defendants are leading cigarette and tobacco manufacturers in control of the tobacco market in the United States, their research councils, and a public relations firm.

 Defendants are Philip Morris Incorporated; RJR Nabisco, Inc.; RJR Nabisco Holdings Corp.; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; Lorillard Tobacco Company; The American Tobacco Company; Liggett Group, Inc.; United States Tobacco Sales and Marketing Company Inc.; The Council for Tobacco Research U.S.A., Inc.; The Tobacco Institute, Inc.; Hill & Knowlton, Inc.; B.A.T Indus-

tries p.l.c.; and British–American Tobacco Company Limited ("BATCo.").

2. On January 8, 1998, defendants filed a motion to dismiss for failure to join necessary parties pursuant to Fed.R.Civ.P. 12(b)(7) [Doc. 28]. In March 1998, Defendants Tobacco Institute, BAT Industries, PLC, Smokeless Tobacco Council, Inc., RJR Nabisco, Inc. and RJR Nabisco Holdings, Inc. filed motions to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). The Court deals with these motions in separate orders.

doctrine and the proximate cause doctrine. After having made this review, the Court concludes that plaintiffs' claims are not generally stopped as too remote.

The Court then decides whether plaintiffs state claims for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO") and the Ohio Pattern of Corrupt Activity Act ("Ohio Corrupt Activity Act"), Ohio Rev.Code §§ 2923.31, *et seq.* In deciding this, the Court examines the federal and Ohio statutory schemes and determines whether the Ohio Corrupt Activity Act is broader than RICO. After considering the federal and Ohio schemes, the Court determines whether plaintiffs state causes under either or both. After making this review, the Court finds that plaintiffs state causes of action under both RICO and the Ohio Corrupt Activity Act.

After determining whether plaintiffs state RICO claims under federal or state law, the Court addresses plaintiffs' antitrust claims under federal and state law. Again, the Court decides whether plaintiffs' claims are too remote and whether the damages claimed by plaintiffs have proximately resulted from defendants' conduct. The Court also looks to whether plaintiffs have standing to make antitrust claims. After making this review the Court finds that plaintiffs have sufficiently stated causes. of action under federal and state antitrust law.

The Court then looks to whether the plaintiffs sufficiently state claims for breach of a voluntarily undertaken duty and for conspiracy. After reviewing these questions, the Court finds plaintiffs do state a cause of action for civil conspiracy upon which relief can be granted. However, the Court finds plaintiffs do not state causes of action for breach of a voluntarily undertaken duties. Accordingly, the Court grants defendants motions to dismiss Counts VI and VII of the Amended Complaint.

## I. Introduction

Plaintiffs are certain trusts organized to provide health-related benefits to workers and their families.[3] The plaintiffs are non-profit, union-sponsored tax-exempt trusts organized under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* The trusts provide medical or hospital care benefits to participants and their beneficiaries as an employee retirement income security program. Trustees govern the trusts. Of the trustees, employers contributing to the trusts typically choose half of the trustees and union member beneficiaries of the trusts choose half of the trustees.

On May 20, 1997, Plaintiffs Funds brought this action against tobacco-related entities.[4] Plaintiffs allege that, since about 1953, the defendants have shifted the large health care costs of smoking onto plaintiffs, proposed class members, and other health care payers. Plaintiffs say defendants expected, foresaw, and planned this shift of expenses. The plaintiffs say that as the direct result of the defendants' wrongdoing, plaintiffs and all similar trust funds had to make substantial expenditures to pay for treatment of smoking-related illnesses and addiction.

Because of this alleged shift of expenses onto the funds, and other medical expense payers, plaintiffs say the defendants have depleted their Trusts of monies otherwise available. Because of this purportedly unlawful conduct, Plaintiffs Funds say they bore the cost of damages caused by the defendants. Plaintiffs allege standing to sue defendants for damage to the business or property of the trust funds. Plaintiffs say they bring this action in fulfillment of their fiduciary duty to replenish the trust funds and to maximize health care benefits for all trust beneficiaries. Plaintiff Funds seek damages and injunctive relief.

**3.** Plaintiffs are Iron Workers Local Union No. 17 Insurance Fund. IBEW Local No. 38 Health & Welfare Fund, Ohio Laborers' District Council–Ohio Contractors' Association Insurance Fund, Dealers–Unions Insurance Fund, Local 47 Welfare Fund No. 1, Toledo Electrical Welfare Fund and their trustees.

Plaintiffs have moved this Court to certify this case as a class action. Consideration of class certification shall be addressed in a subsequent opinion and order of the Court.

**4.** The Funds can sue or be sued in their own name. *See* ERISA, 29 U.S.C. § 1132(d)(1) ("An employee benefit plan [like the Funds] may sue or be sued under this subchapter as an entity."); *Whitworth Bros. Storage Co. v. Central States, Southeast & Southwest Areas Pension Fund,* 794 F.2d 221, 224 n. 2 (6th Cir.1986).

In Counts I, II, and III, plaintiffs make claim under the federal RICO provisions of the Organized Crime Control Act of 1979. 18 U.S.C. § 1961, *et seq.* In Counts XIV, XV, and XVI, plaintiffs make claim under the Ohio equivalent of RICO, the Ohio Pattern of Corrupt Activity Act, Ohio Rev.Code §§ 2923.31, *et seq.* In Counts IV and X of the Amended Complaint, the plaintiffs make two antitrust claims. In Counts VI and VII, plaintiffs make claim for intentional and negligent breach of a special duty. Finally, plaintiffs make claim for civil conspiracy in Count XI of their Amended Complaint.[5]

Defendants now seek dismissal of all plaintiffs' claims. In seeking dismissal, defendants say certain reasons stop all claims made by plaintiffs. Separately, defendants say certain defenses stop individual claims. In ruling upon defendants' motion to dismiss, the Court first examines defendants' more generalized defenses. Chief among these defenses is the argument that plaintiffs' claims are too remote to allow recovery. After reviewing defendants' more generalized arguments, the Court moves to defendants' more specific arguments for dismissal.

## II. Standard of review

A court properly grants a motion to dismiss under Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle her to relief. *See McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). We accept as true and construe all factual allegations in the complaint in the light most favorable to the plaintiff. *U.S. ex rel. McKenzie v. Bellsouth Telecommunications, Inc.*, 123 F.3d

935 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998).[6] Applying this standard, the Court considers the instant motions.

## III. Discussion

### A. General discussion of remoteness

Defendants argue generally that plaintiffs' claims are too remote to allow relief and, for this reason, the Court should dismiss all of plaintiffs' claims. Because the Court finds the defense of remoteness differs depending on the claim involved, the Court denies defendants' generalized request for dismissal on this ground. Instead, the Court finds that a more claim-specific examination is needed. Nonetheless, a discussion of defendants' general remoteness argument lends assistance to the Court's examination of particular claims.

■ In seeking dismissal on grounds of remoteness, defendants say that plaintiffs' action is one simply to recover medical expenses incurred by another. Claiming that plaintiffs' claim is only to recover medical expenses incurred by another, defendants say these claims are too remote to give a common law right to reimbursement through "direct" or "independent" claims. If the claims are too remote, then plaintiffs are limited to bringing an action as an assignee or subrogee.[7] However, if the claims are found direct, Plaintiffs Funds would avoid some or all of the defenses that would potentially stop subrogated claims.

To support their view that plaintiffs' claims are too remote to allow recovery, the defendants claim support from a plethora of old

---

5. On September 8, 1998, Plaintiffs dismissed without prejudice claims for fraud (Count V), for unjust enrichment (Count IX), and for violation of the Deceptive Trade Practices Act (Count XII). Plaintiffs earlier withdrew claims for breach of warranty (Count VIII), for violation of ERISA (Count XIII), for strict product liability (Count XVII), and for negligence (Count XVIII). Therefore, Counts V, VIII, IX, XII, XIII, XVII, and XVIII of the Amended Complaint are dismissed.

6. Because all factual allegations in the complaint are accepted as true and construed in the light most favorable to the plaintiff, the court describes this case as plaintiffs allege in their pleadings. Of course, proof of plaintiffs' allegations await later determination.

7. If so limited, the plaintiffs would need to make additional showings. "According to the general rule, an assignee or subrogee of a claim stands in the shoes of the assignor or subrogor, and succeeds to all the rights and remedies of the latter." *Inter Ins. Exch. of the Chicago Motor Club v. Wagstaff*, 144 Ohio St. 457, 460, 59 N.E.2d 373 (1945). Further, a subrogee may only assert claims the subrogor could assert. *Kurent v. Farmers Ins. of Columbus, Inc.*, 62 Ohio St.3d 242, 247, 581 N.E.2d 533 (1991). In short, "standing in the shoes" of these participants would require the Funds to offer individual proofs (and overcome affirmative defenses) for each smoker as to whom subrogation is claimed.

cases, including the 1846 Massachusetts case, *Anthony v. Slaid,* 52 Mass. (11 Met.) 290 (1846). In *Slaid,* a party contracting to provide support to paupers made claim against a party who had tortuously caused injury to an indigent. The Massachusetts Supreme Judicial Court denied recovery, finding that the damage was too remote and indirect.[8]

To decide whether the reasoning of *Slaid* should stop the present claims, a review of the principles of remoteness, proximate causation, and standing is beneficial. Scrutiny of the classic decision *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), aids this review. In *Palsgraf,* the decision by Chief Judge Cardozo and the dissent by Judge Andrews respectively set out arguments suggesting a limitation on tort claims and arguments allowing a broader scope of claims.[9]

In *Palsgraf,* railway employees negligently pushed a passenger onto a departing train. While boarding the train in this way, the passenger dropped a package of fireworks, which exploded upon hitting the ground. The shock of the explosion dislodged scales at the other end of the platform, many feet away. The scales struck the plaintiff, causing injuries for which she sued and recovered judgment.

Judge Cardozo's majority opinion reversed a jury verdict in favor of Plaintiff Palsgraf and against the railway. In denying recovery, Cardozo found that the injuries foreseen control the scope of duty. Cardozo found that a plaintiff may recover in negligence only if her injury was one that a defendant exercising reasonable foresight (less than "extravagant prevision") would have foreseen. The court there ruled:

> Negligence, like risk, is thus a term of relation. . . . One who seeks redress at law does not make out a cause of action by showing without more that there has been damage to his person. If the harm was not willful, he must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be pro-

tected against the doing of it though the harm was unintended.

*Id.* at 345, 162 N.E. 99 (citations omitted).

Cardozo's argument breaks down into two parts: (1) a plaintiff has a right of action in negligence only if the defendant's conduct was negligent relative to her; and (2) if the plaintiff's injury was not reasonably foreseeable, then the defendant's act was not negligent relative to her. Central to Cardozo's argument is the suggestion that tort law does not afford a remedy for merely unsocial conduct:

> The argument for the plaintiff is built upon the shifting meanings of such words as 'wrong' and 'wrongful,' and shares their instability. What the plaintiff must show is 'a wrong' to herself; i.e., a violation of her own right, and not merely a wrong to some one else, nor conduct 'wrongful' because unsocial, but not 'a wrong' to any one.

*Id.* at 343–44, 162 N.E. 99.

To decide if a tort plaintiff is within the orbit of those protected against a defendant's wrongful conduct, Cardozo suggested that "[t]he risk reasonably to be perceived defines the duty to be obeyed." Moreover, "[t]his does not mean, of course, that one who launches a destructive force is always relieved of liability, if the force, though known to be destructive, pursues an unexpected path. 'It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.'" *Id.* at 344, 162 N.E. 99 (quoting *Munsey v. Webb,* 231 U.S. 150, 156, 34 S.Ct. 44, 58 L.Ed. 162 (1913)). Cardozo further ruled that if acts are imminently dangerous to anyone who may come within contact, the law will find a duty of prevision not far from that of an insurer. *Id.* at 344, 162 N.E. 99. Willfully dangerous acts or intentional acts support a broader scope of duty. *Id.*

In dissent, Judge Andrews argued for a broader scope of those able to bring tort claims. Andrews argued that the wrongdoer

---

**8.** See also *Great American Insurance Co. v. United States,* 575 F.2d 1031 (2nd Cir.1978).

**9.** Cardozo's *Palsgraf* opinion enjoyed a narrow majority. Three judges concurred in the majority opinion of Cardozo while two judges joined the dissent of Andrews.

should be liable, without limitation, for all damages shown to have resulted from the wrongful conduct. Andrews explained his reasoning:

> [W]e are told that 'there is no negligence unless there is in the particular case a legal duty to take care, and this duty must be not which is owed to the plaintiff himself and not merely to others.' This I think too narrow a conception. Where there is the unreasonable act, and some right that may be affected there is negligence whether damage does or does not result. That is immaterial. Should we drive down Broadway at a reckless speed, we are negligent whether we strike an approaching car or miss it by an inch. The act itself is wrongful. If [sic] is a wrong not only to those who happen to be within the radius of danger, but to all who might have been there—a wrong to the public at large.
>
> * * * * * *
>
> Due care is a duty imposed on each one of us to protect society from unnecessary danger, not to protect A.B. or C alone.
>
> * * * * * *
>
> The proposition is this: Every one owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others. Such an act occurs. Not only is he wronged to whom harm, might reasonably be expected to result, but he also who is in fact injured, even if he be outside what would generally be thought the danger zone. There needs be duty due the one complaining, but this is not a duty to a particular individual because as to him harm might be expected. Harm to some one being the natural result of the act, not only that one alone, but all those in fact injured may complain.

*Id.* at 348–50, 162 N.E. 99 (citations omitted).

The *Palsgraf* decision, like *Slaid*, deals with the question of duty. Stated simply, does the defendant stand in such relation to the plaintiff that the law will impose obligations and consequences resulting from the defendant's acts or omissions?

Contrary to the arguments that defendants here make, the determination of duty lacks precision. As Dean Prosser explained:

> In the decision whether or not there is a duty, many factors interplay: the hand of history, our idea of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

Dean Prosser, *Palsgraf Revisited*, 52 Mich. L.Rev. 1, 15 (1953) (footnotes omitted).

Prosser states the issue:

> Essentially, the choice is between an innocent plaintiff and a defendant who is admittedly at fault. If the loss is out of all proportion to the defendant's fault, it can be no less out of proportion to the plaintiff's innocence. If it is unjust to the defendant to make him bear the loss which he could not have foreseen, it is no less unjust to the plaintiff to make him bear a loss which he could not have foreseen and which is not even due to his own negligence but to that of another. In these cases there is no justice to be had.[10]

To place some limit upon liability for negligent acts, Prosser suggests that there must be some "reasonably close connection between the harm threatened and the harm done." Prosser, *Palsgraf Revisited*, at 27.

■ "Proximate cause" is the limitation that courts place upon an actor's responsibility for the consequences of his conduct. In reality, an act's consequences go on forever.[11]

---

10. Dean Prosser, *Palsgraf Revisited*, 52 Mich. L.Rev. 1, 17 (1953). While criticizing Cardozo for failing to give reasoned guidance for deciding the issues of duty and proximate cause, Prosser recognized the need to place some limit upon liability:

> There is still the problem of an end to liability, of a place to stop. It is still unthinkable that any one shall be liable to the end of time for all of the results that follow in endless sequence from his single act.

Dean Prosser, *Palsgraf Revisited* at 24.

11. Prosser, Law of Torts § 41, at 236 (4th ed.1971). "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond.... Thus, it could be ar-

As suggested by Prosser, we can make a strong argument that it is more equitable to visit responsibility for unforeseen consequences upon the wrongdoer rather than upon the victim. Nevertheless, the law limits a wrongdoer's responsibility for his wrongful acts to avoid a flood of litigation and to avoid the uncertainty attending less direct claims. By shifting the expense to the victim rather than the tortfeasor, the law limits claims to those causes that are so closely connected with the result and of such significance that the law is justified in imposing liability.

The proximate cause requirement, therefore, limits a defendant's liability. While the reasons for a proximate cause requirement are easily articulated, defining when proximate cause exists is uncertain.

Judicial denial of derivative claims is less clear than defendants suggest. For example, a spouse or parent or child can bring an independent claim for loss of the services of an injured wife or husband or child [12] or parent.[13]

Likewise, an employer may bring an action for negligent injury to his employee. See *Cincinnati Bell Telephone Company v. Straley*, 40 Ohio St.3d 372, 380–81, 533 N.E.2d 764 (1988) (citing *Ledex, Inc. v. Heatbath Corp.*, 10 Ohio St.3d 126, 461 N.E.2d 1299 (1984) and *Midvale Coal Co. v. Cardox Corp.*, 152 Ohio St. 437, 89 N.E.2d 673 (1949)) (employer whose employee suffers injuries and recovers workers' compensation benefits may bring an action for increased workers' compensation premiums against a third party whose conduct caused the employee's injuries.); Ohio Rev.Code § 4123.931 (statutorily recognized right of an employer to bring an action for increased workers compensation expenses against third party tortfeasor.). Further, a party not in privity with an accountant can bring an action for damages resulting from negligence of the accountant. *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 436 N.E.2d 212 (1982) (syllabus at paragraph one) ("An accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation they specifically foresee."). As indicated by these examples, the determination of relationship necessary to support a cause of action is less clean than suggested by defendants.

In claiming that they owed plaintiffs no duty in the instant case, defendants say that plaintiffs' claims are too indirect to go forward. Defendants say that the law does not allow recovery by third parties, i.e., parties not themselves directly injured. In making their general claim that plaintiffs' claims are too remote, defendants primarily rely upon cases that deal with proximate cause or directness in the "negligence" context.[14] However, the tests of proximate causation

gued that the fatal trespass done by Eve was the cause of all our woe." *Id.*

12. *See Grindell v. Huber*, 28 Ohio St.2d 71, 275 N.E.2d 614 (1971) (syllabus at paragraph one) (stating when a minor child suffers an injury, allegedly as a result of the negligence of a defendant, two separate causes of action arise: an action by the child for his or her personal injuries, and a derivative action in favor of the parents for loss of services and medical expenses.).

13. The Supreme Court of Ohio recognized a minor child's cause of action for loss of parental consortium against one who has negligently harmed the child's parent in *Gallimore v. Children's Hospital Med. Ctr.*, 67 Ohio St.3d 244, 617 N.E.2d 1052 (1993) (syllabus at paragraph two).

14. The Ohio Supreme Court generally defines proximate cause consistent with Cardozo's majority opinion in *Palsgraf*. The Ohio Supreme Court, in *Piqua v. Morris*, 98 Ohio St. 42, 120 N.E. 300 (1918), defined proximate cause in paragraph one of the syllabus:

> The 'proximate cause' of a result is that which in a natural and continued sequence contributes to produce the result, without which it would not have happened. The fact that some other cause concurred with the negligence of a defendant in producing an injury does not relieve him from liability, unless it is shown such other cause would have produced the injury independently of defendant's negligence.

In *Armour & Co. v. Ott*, 117 Ohio St. 252, 257, 158 N.E. 189 (1927), the Ohio Supreme Court approved the following definition for remote cause: " ... an injury that could not have been foreseen or reasonably anticipated as the probable result of an act of negligence ...."

No liability can result to a party, "[e]ven if negligence of a party is a cause of injury to another," if the cause is a remote one. *Tanzi v. N.Y. Cent. R. Co.*, 155 Ohio St. 149, 98 N.E.2d 39, " '159 patent" (1951).

and remoteness are not the same for all types of claims. The tests for remoteness and proximate causation differ for the varied statutory, intentional tort, and equitable contexts in which plaintiffs' claims here arise.

■ The decision of whether a defendant should respond to claims from less directly injured claimants require examination of whether there is a reasonable connection between the defendant's acts and its consequences.

To decide whether the defendants' acts and failures to act alleged in the Amended Complaint have a reasonable connection to the greatly increased expenses visited upon the plaintiffs, the Court looks to relevant precedent for guidance.[15]

As later described, plaintiffs make claim against defendants under RICO. In making the general argument that plaintiffs do not have standing, Defendants suggest support in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).[16] In *Holmes*, the Supreme Court reviewed whether a nonprofit corporation had standing, under RICO, to sue employees of a defunct securities brokerage firm. In bringing its action, the nonprofit corporation had sought and obtained approval for the appointment of a trustee to liquidate a securities broker-dealer. The nonprofit corporation and the trustee then brought a RICO action against persons alleged to have conspired in a fraudulent scheme that led to the end of two companies.

In the circumstances of the *Holmes* case, the Supreme Court found that plaintiffs in a RICO action must show not only a direct injury but also must show that defendant's conduct was a proximate cause of plaintiff's injury:

> Here we use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient."

*Id.* at 268, 112 S.Ct. 1311.

In deciding whether a plaintiff shows proximate injury under the federal RICO law, the Supreme Court found that a party is *generally* required to show a direct injury to have standing. It is generally insufficient under RICO to complain of harm "flowing from the misfortunes visited upon [another] person by the defendant's acts." *Id.* The *Holmes* Court found that the plaintiffs could not make claim for injuries more directly visited upon third parties. The *Holmes* Court emphasized that others were positioned to make the same claims: "Although the customers' claims are senior (in recourse to 'customer property') to those of the broker-dealers' general creditors, the causes of their respective injuries are the same." *Id.* at 271, 112 S.Ct. 1311.[17]

■ Because the proximate cause determination is a policy decision about who will bear the expense of extended damage, courts should consider the original reasons for the proximate cause rule. The decision involves choosing between "an innocent plaintiff and a defendant who is admittedly at fault." To decide this, the *Holmes* Court directed consideration of the difficulty the plaintiff has in showing that its damages flowed from the

---

**15.** The parties here identify no clearly controlling precedent of the Sixth Circuit.

**16.** In making the claim that plaintiffs' claims are too remote to allow the action to proceed, defendants offensively misrepresent the *Holmes* holding to the Court. Thus, defendants represent to this Court: "[In *Holmes v. Securities Investor Protection Corp.*, [the Supreme Court] held that a RICO plaintiff who "complain[s] of harm flowing merely from the misfortune, visited upon a third person by the defendant's acts ... stand[s] at too remote a distance to recover." " *Holmes*, 503 U.S. at 268–69, 112 S.Ct. 1311.

The complete quote from *Holmes* is: "Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *See, e.g.*, 1 J. Sutherland, Law of Damages 55–56 (1882).

Defendants' misrepresentation is obvious. First, the quoted language describes general language from a treatise without clearly adopting the treatise. The Supreme Court does not clearly adopt the description in the treatise. Second and more important, the defendants remove the term "generally" in an effort to cause this Court to misunderstand the *Holmes* holding.

**17.** In *Holmes*, more directly injured parties had already brought an action complaining of the same conduct. 503 U.S. at 273, 112 S.Ct. 1311.

defendant's conduct, the risk of double recovery, and, importantly, whether the defendant's conduct is sufficiently harmful to warrant deterrence. *Holmes,* 503 U.S. at 269, 112 S.Ct. 1311.

In deciding a motion to dismiss, we accept plaintiffs' allegations that defendants' conduct caused damages. Stated another way, the standing issue does not involve whether defendants' conduct caused plaintiffs great financial damage. Instead, ruling on defendants' motion requires the Court to consider whether, considering the conduct and damages alleged, and "on the basis of the mores of the community,"[18] a party should avoid damages that party caused.[19]

At this juncture, the Court finds that plaintiffs allege facts that would allow recovery. First, plaintiffs do not bring a negligence action. Statutes and court interpretations of those statutes define the proximate cause elements of plaintiffs' RICO and antitrust claims. *See, e.g., National Organization for Women v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ("NOW") (describing the proximate cause/directness requirement of a RICO claim); *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (same); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (describing antitrust standing requirements); *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (same).

Second, plaintiffs allege that defendants acted intentionally in causing harm to plaintiffs. "In cases of willful or malicious injury, and injury from reckless or illegal acts, or from positive fraud, the damages are not so strictly confined to proximate consequences as when these elements do not exist.... Where there is fraud or other intentional wrong, there is not the same strictness to exclude remote or uncertain damages, even where punitory damages are not involved." *Burckhardt v. Burckhardt,* 42 Ohio St. 474, 487(1885).[20] See also Restatement (Second) of Torts § 435B.

As suggested by plaintiffs, proximate causation is broader with regard to intentional acts than it is for negligent acts. The Comments to Restatement (Second) of Torts § 435B support this contention:

> "[R]esponsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent ...."

Restatement (Second) of Torts § 435B. ch.16., cmt. a (1965).

An act is intentional when "'the actor desires to cause consequences of his act, or ... he believes that the consequences are substantially certain to result from it.'" *Sicard v. Univ. of Dayton,* 104 Ohio App.3d 27, 30, 660 N.E.2d 1241 (Ohio App.2nd Dist.1995) (quoting *Marchetti v. Kalish,* 53 Ohio St.3d 95, 96 n. 2, 559 N.E.2d 699 (1990)).[21] See also *Monsler v. Cincinnati Cas. Co.,* 74 Ohio

---

**18.** Prosser, *Palsgraf Revisited,* at 15. The mores of communities evolve. In a letter to Samuel Kercheval on July 12, 1816, Thomas Jefferson spoke to change in the law:

> I am not an advocate for frequent changes in laws and constitutions, but laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times. We might as well require a man to wear still the coat that fitted him when a boy as civilized society to remain ever under the regimen of their barbarous ancestors.

Quoted in *Klever v. Canton Sachsenheim, Inc.,* No.1998–CA–0010 (Ohio Ct.App. 5th Dist. August 10, 1998) (Gwin, W.S.) (unreported).

**19.** Defendants deny that their acts or omissions caused any damage. In reviewing defendants' motion for judgment, plaintiffs' allegations that defendants' acts caused damages are taken as true.

**20.** In *Burckhardt,* the Supreme Court of Ohio explained its approach:

> That the person injured shall received[sic] a compensation commensurate with his loss or injury, is the universal and cardinal principle of the law of damages. This principle is paramount, and by it all rules on the subject of compensatory damages are tested and corrected.

42 Ohio St. at 487.

**21.** The *Sicard* case quotes from 1 Restatement (Second) of Torts § 8A, at 15 (1965).

App.3d 321, 328, 598 N.E.2d 1203 (Ohio App.10th Dist.1991) ("An act is intentional in the context of civil liability if (1) it is done willingly, and either (2) the actor desires the results of his conduct, or (3) the actor knows, or ought to know, the result will follow from his conduct.") (citation omitted). As the plaintiffs allege intentional conduct, "the responsibility for harmful consequences should be carried further." Comments to Restatement (Second) of Torts § 435B.

■ The determinations of proximate cause, standing, and remoteness are particularly matters of policy. Plaintiffs bring different causes of actions with different considerations for standing. The Court finds that plaintiffs' standing to bring various actions must be individually judged. Accordingly, the defendants' blanket argument for dismissal on remoteness grounds fails.

IV. Standing to bring RICO actions.

A. General discussion of standing for RICO claims.

In determining whether a party has standing to bring a RICO action, the *Holmes* Court said courts should consider: (1) the difficulty the plaintiff has in showing that damages flowed from the defendant's conduct; (2) the risk of double recovery; and (3) whether the defendant's conduct is sufficiently injurious to warrant deterrence. *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311.

■ While disputed, plaintiffs show evidence, that if believed, would show that damages directly resulted to plaintiffs from defendants' conduct. Plaintiffs suggest they will offer epidemiological evidence showing that defendants' conduct greatly increased the expenses of affording coverage to beneficiaries. Some medical research suggests that smoking causes 10 percent of the nationwide medical expenses.[22] Plaintiffs claim that union members' beneficiaries smoke at rates greater than the general population. Plaintiffs suggest that they will show that nearly 10 percent of the hundreds of millions of dollars they have spent on health care has been caused by defendants' unlawful conduct.

As described, the *Holmes* Court delineated three considerations for determining whether damages caused by violation of RICO should not be allowed on proximate cause grounds. Under the first factor, the Court focused on the difficulty the plaintiff has in showing that damages flowed from the defendant's conduct. 503 U.S. at 269, 112 S.Ct. 1311. The plaintiff avers major damages to their trusts from being required to absorb medical expenses caused by defendants. The Court finds that this factor weighs in favor of a finding of proximate relationship.

The *Holmes* Court described a second consideration in the policy grounded determination of proximate causation in RICO actions: whether we should stop claim for injury because of the risk of double recovery. *Id.*

Defendants suggest that they would be exposed to double recovery should this Court permit plaintiffs to bring this action. Specifically, defendants say that both Fund beneficiaries and the plaintiffs would seek, and might recover, for the same damages.

**22.** The Amended Complaint alleges that cigarette smoking is the leading cause of premature death in the United States. Plaintiffs allege that cigarette smoking kills more than 400,000 Americans each year, more than the combined deaths caused by automobile accidents. AIDS, alcohol use, use of illegal drugs, homicide, suicide and fires. Plaintiffs say smoking-related illnesses account for one of every five deaths in the United States. Amended Complaint at ¶¶ 53–57.

See U.S. Dep't of Health, Educ. & Welfare, *The Health Consequences of Smoking: A Public Health Service Review* 34, 135 –38 (1967); Advisory Comm. to the Surgeon General of the Public Health Service, U.S. Dep't of Health, Educ. & Welfare, *Smoking and Health* 31 (1964). *See also* Richard Scruggs, *Tobacco Litigation: a Problem That Needs a Solution*, 41 N.Y.L. Sch. L.Rev. 487, 487–88 (1997); Raymond E. Gangarosa et al.,

*Suits by Public Hospitals to Recover Expenditures for the Treatment of Disease, Injury and Disability Caused by Tobacco and Alcohol*, 22 Fordham Urb. L.J. 81, 81–103 (1994).

Researchers from the University of California and the Centers for Disease Control estimate smoking-related medical care in 1993 at $50 billion. Others suggest that ten to twenty percent of all health care dollars are spent treating tobacco-related illnesses. C. Everett Koop. *A Tax That's Good for You*, Wash. Post. Sept. 21, 1993, at A19 (cited in D. Garner and R. Whitney, *Protecting Children From Joe Camel And His Friends: a New First Amendment and Federal Preemption Analysis of Tobacco Billboard Regulation*, 46 Emory L.J. 479 (1997)); *Medical Care Expenditures Attributable to Cigarette Smoking— United States, 1993*. 43 Morbidity & Mortality Wkly. Rep. 469, 470 (1994).

■ The Court finds little potential for double recovery. First, an injured smoker beneficiary could not recover under antitrust or RICO for the medical costs paid by any of the plaintiffs' trust funds. Both antitrust law and RICO require a showing of injury to a plaintiff's business or property. Medical expenses paid on the behalf an injured smoking beneficiary could not make up a monetary loss or other injury to a smoker's "business or property." *See* Clayton Act § 4, 15 U.S.C. § 15 (antitrust); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (antitrust injury to property includes loss of money, excludes personal injuries); 18 U.S.C. § 1964(c) (RICO); *Steele v. Hospital Corp. of America*, 36 F.3d 69, 70 (9th Cir.1994) ("[I]f the patients have paid none of the allegedly excessive charges out of their own pockets because those charges were covered by insurance, then they have suffered no financial loss," and plaintiff patients have no injury to their business or property).[23]

■ Moreover, the single satisfaction rule would allow defendants to seek credit for amounts paid plaintiffs in antitrust and RICO litigation in later personal injury litigation by beneficiaries. *Zenith Radio Corp.*

*v. Hazeltine Research, Inc.*, 401 U.S. 321, 348, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (antitrust);[24] *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 599–601 (2nd Cir.1989) (RICO), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); *Morley v. Cohen*, 888 F.2d 1006, 1012–13 (4th Cir.1989) (RICO, citing antitrust and tort cases);[25] Restatement (Second) of Torts § 885(3) (torts).[26] The payment by defendants of a judgment or settlement would give defendants a defense of satisfaction in any other suit in which an injured smoker/trust beneficiary might seek to recover any of the costs sought here. Defendants would not have to pay for the same medical cost damages twice.

Having found that there is no major difficulty showing that defendants' conduct caused damage to the plaintiffs trust funds, and having found that there is little risk of a double recovery, the Court turns to the third factor suggested by the *Holmes* Court: whether the defendant's conduct is sufficiently harmful to warrant deterrence. *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311.

The Amended Complaint alleges seriously wrongful conduct on defendants' part. Moreover, the Amended Complaint alleges extremely large damages flowed from defendants' claimed unlawful conduct.

**23.** The *Holmes* Court cited the pendency of an action by the broker-dealers as suggesting the Court not afford a remedy:

Finally, the law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication. As noted above, the broker-dealers have in fact sued in this case, in the persons of their SIPA trustees appointed on account of their insolvency.

503 U.S. at 273, 112 S.Ct. 1311.

**24.** *See also Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 894 (2nd Cir.1988) (antitrust); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1086 (2nd Cir.1988) (antitrust), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988); *Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 391–95 (4th Cir.1982) (antitrust), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *Hydrolevel Corp. v. American Soc'y of Mechanical Eng'rs, Inc.*, 635 F.2d 118, 130 (2d Cir.1980), *aff'd.* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Baughman v. Cooper–Jarrett, Inc.*, 530 F.2d 529, 533–34 (3rd Cir.1976) (antitrust), *cert. denied*, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 397–98 (9th Cir.1957)

(antitrust), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

**25.** *See also Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 n. 3 (D.C.Cir. 1991) (RICO), *cert. denied*, 502 U.S. 822, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir.1987) (RICO), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

**26.** *See also United States Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1236 (10th Cir.1988) (securities); *Harris v. Union Elec. Co.*, 846 F.2d 482, 485 (8th Cir.1988) (securities); *Marcus, Stowell & Beye Gov't. Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 233 (5th Cir.1986) (contract); *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1508 (11th Cir.1985) (torts); *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (torts), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); *Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 803 (5th Cir.1983) (securities); *Howard v. General Cable Corp.*, 674 F.2d 351, 358 (5th Cir.1982) (torts); *Franklin Supply Co. v. Tolman*, 454 F.2d 1059, 1072 (9th Cir.1971) (torts).

Plaintiffs allege that for decades, defendants have known that nicotine is addictive and is the reason that people continue to smoke cigarettes and use smokeless tobacco.[27] Plaintiffs claim that defendants have long known that cigarettes and smokeless tobacco create addiction and causing cancer, heart disease, emphysema, cataracts, adverse pregnancy outcomes, and other diseases and death.[28] The plaintiffs say defendants had the means of manufacturing and marketing safer and less-addictive tobacco products, yet conspired not to do so.[29]

Despite such knowledge and ability to market safer products, plaintiffs say defendants fraudulently promised to conduct objective research and reveal accurate information as to all aspects of smoking and health and then suppressed information that cigarettes were harmful. Plaintiffs further contend the defendants manipulated nicotine content to create and maintain addiction and inhibited the development and marketing of safer, less-addictive cigarettes and smokeless tobacco.[30] Plaintiffs also say the defendants lied to Congress under an oath about their knowledge of the dangers and addictiveness of their products.[31]

In deciding whether this Court should dismiss this action on remoteness or proximate cause grounds, *Holmes* directs this Court to consider whether the defendant's conduct is sufficiently injurious to warrant deterrence. *Holmes,* 503 U.S. at 269, 112 S.Ct. 1311. If proven, one can scarcely imagine conduct more harmful. See footnote 21.

Having found that proving the plaintiffs' damages flowed from defendants RICO violation is not unduly difficult, and having found there is little risk of double recovery for defendants purported RICO violations, and having found that, if proven, defendants conduct is sufficiently injurious to warrant deterrence, the factors described in *Holmes* suggest this Court not dismiss plaintiffs RICO counts on standing or proximate cause grounds.

### B. Plaintiffs' State Law RICO Claim—Standing

■ In Counts XIV, XV, and XVI, the plaintiffs make claim under the Ohio equivalent of RICO, the Ohio Pattern of Corrupt Activity Act, Ohio Rev.Code §§ 2923.31, *et seq.* Plaintiffs allege that the tobacco companies have violated §§ 2923.32(A)(1), (2) and (3) of the Ohio Corrupt Activity Act.[32]

In seeking dismissal of these state law RICO claims, defendants argue that Plaintiffs Funds cannot establish that defendants' violations of RICO proximately caused their injuries. As support for their assertion, defendants say that plaintiffs were not directly injured and cannot bring a direct action. Separately, defendants assert that plaintiffs do not allege facts showing that they suffered injury to their "business or property."

■ To decide whether plaintiffs allege sufficient facts to avoid dismissal on standing grounds, the Court first examines the Ohio RICO law. In doing so, this Court is mindful that determinations of proximate cause,

---

**27.** Amended Complaint at ¶¶ 2, 165, 172–189. Thus, the Amended Complaint alleges that in 1962, Sir Charles Ellis, a science advisor to the board of the parent of Brown & Williamson stated that "smoking is a habit of addiction" and that "nicotine is not only a very fine drug, but the technique of administration by smoking has considerable psychological advantages..." Plaintiffs allege he described Brown & Williamson as being "in the nicotine rather than the tobacco industry". Amended Complaint at ¶ 165.

Plaintiffs also allege that the general counsel of Brown & Williamson, wrote in 1963: "Moreover, nicotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms." *Id.*

**28.** Amended Complaint at ¶¶ 53–62, 109. Thus, plaintiffs allege that a 1958 memorandum at Philip Morris stated "the evidence ... is building up that heavy cigarette smoking contributes to

lung cancer either alone or in association with physical and physiological factors ..." Amended complaint ¶ 109.

**29.** Amended Complaint at ¶¶ 147–162.

**30.** Amended Complaint at ¶¶ 74, 163–221, 147–162. Thus, plaintiffs allege that internal Philip Morris reports in the 1970s stated:

"The cigarette should be conceived not as a product but as a package. The product is nicotine.... Think of the cigarette pack as a storage container for a day's supply of nicotine.... Think of the cigarette as a dispenser for a dose unit of nicotine."
Amended Complaint at ¶ 177.

**31.** Amended Complaint at ¶¶ 63–65, 78.

**32.** Amended Complaint at ¶¶ 255–291, 398–434.

standing and remoteness are particularly matters of policy. Accordingly, courts should be especially respectful of legislative decisions. Additionally, courts should consider the difficulty of proof, the potential for multiple recoveries, and the need to place some limit upon the number of claims flowing from a wrongful act.

With Ohio Rev.Code § 2923.34, the Ohio General Assembly provided for a civil action for violation of Ohio Rev.Code § 2923.32.[33] In providing for a civil action, the General Assembly addressed who should have standing to bring such action for triple damages and attorney's fees. In pertinent part, § 2923.34(F) provides:

> (F) In a civil proceeding under division (B) of this section, any person *directly or indirectly* injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, . . . shall have a cause of action for triple the actual damages he sustained. . . .

Ohio Rev.Code § 2823.34(F) (emphasis added).

In affording a cause of action to any person directly or *indirectly* injured, the Ohio General Assembly departed from the language used by Congress in affording a federal cause of action under the federal RICO law. Title 18 U.S.C. § 1964 provides in pertinent part:

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

Even a cursory review shows that the Ohio General Assembly largely patterned the Ohio Pattern of Corrupt Activity Act after the federal cause of action.[34] Yet while similar, the Ohio General Assembly made obvious and significant departures. Most pertinent to the issues here, the Ohio General Assembly stated that persons injured both directly and indirectly by violations of § 2923.32 had standing to bring an action under Ohio's RICO law.

■ "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." *Thompson Elec., Inc. v. Bank One, Akron, N.A.*, 37 Ohio St.3d 259, 264, 525 N.E.2d 761 (1988) (quoting paragraph three of the syllabus in *Baker v. Powhatan Mining Co.*, 146 Ohio St. 600, 67 N.E.2d 714 (1946)). As the Ohio Supreme Court held in *Iddings v. Bd. of Educ. of Jefferson Cty. Sch. Dist.*, 155 Ohio St. 287, 98 N.E.2d 827 (1951):

> It has been so frequently stated as to become axiomatic that the meaning and intent of a legislative enactment are to be determined primarily from the language itself. The plain provisions of a statute must control. If there is no ambiguity therein there is no occasion to construe or interpret. To construe or interpret what is already plain is not interpretation but legislation, which is not the function of courts. When the meaning is plain from the language employed, an attempt to construe it only tends to make ambiguous that which is simple and clear.

*Id.* at 290, 98 N.E.2d 827.

■ Where a legislature makes a difference from patterned legislation, such change

---

33. Ohio enacted its version of RICO on June 20, 1985, creating the criminal offense of "engaging in a pattern of corrupt activity." Ohio Rev.Code § 2823.32(B)(1). These statutes took effect on January 1, 1986.

34. *See State v. Thrower*, 62 Ohio App.3d 359, 369, 575 N.E.2d 863 (Ohio App.9th Dist.1989) ("The Ohio RICO statute was based on the [f]ederal RICO statute and statutes passed by other states."). Congress explicitly directed that the RICO statute be "liberally construed to effectuate its remedial purposes." *Russello v. United States*, 464 U.S. 16, 27, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). The Sixth Circuit also recognizes "the broad construction of RICO." *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, 900 F.2d 882, 887 (6th Cir.1990). RICO is written "[i]n terms variously described as 'broad' . . . 'expansive' . . . and 'sweeping'." *County of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir.1989) (quoting *Associated General*, 459 U.S. at 529, 103 S.Ct. 897, *McCready*, 457 U.S. at 472, 102 S.Ct. 2540, and *Southaven*, 715 F.2d at 1081).

suggests the desire to alter previous understandings: "It is axiomatic that it will be assumed that the General Assembly has knowledge of prior legislation when it enacts subsequent legislation." *State v. Frost*, 57 Ohio St.2d 121, 125, 387 N.E.2d 235 (1979).

In reviewing an antitrust claim in *Minnesota, v. Philip Morris Inc.* 551 N.W.2d 490, 495 (1996), the Minnesota Supreme Court reviewed similar language. There, a Minnesota antitrust law provided for a cause of action for "[a]ny person, any governmental body, or the state of Minnesota or any of its subdivisions or agencies, injured directly or indirectly by a violation" of the Minnesota antitrust laws. *Id.* (citing to Minn.Stat. § 325D.57 (1994)). The Court found "that this expansive grant of standing reaches the [antitrust] injuries suffered by Blue Cross." *Id.* at 496.

In choosing to broaden standing to bring RICO actions under state law, the Ohio General Assembly decided to widen the right to bring an action. Such determination is clearly a policy matter. Making this policy decision is within the prerogative of the legislature. Courts need show extreme deference to the policy determinations of the popularly elected legislature.

Because the Ohio General Assembly has determined that persons indirectly injured should have standing to bring an action under the Ohio Pattern of Corrupt Activity Act, the Court finds defendants' standing argument here without merit. Accordingly, the Court denies defendants' motion to dismiss Counts XIV, XV, and XVI of the Amended Complaint.[35]

### C. Plaintiffs' Federal Law RICO Claim—Standing

As noted, 18 U.S.C. § 1964(c) gives a cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Defendants principally say that plaintiffs lack standing to bring this federal RICO action because they did not suffer any direct injury.

In making their defense on standing, defendants principally rely upon *Holmes*, in which the Supreme Court examined the standing requirement of the federal civil RICO provision. In *Holmes*, the Supreme Court found that Congress had modeled § 1964(c) of the RICO law on the Clayton Act. The Clayton Act had been interpreted as requiring a plaintiff to show that its damages were both the direct result and the proximate result of defendants' conduct.

In *Holmes*, the Supreme Court required a RICO plaintiff to show that the defendant's unlawful conduct violation was both the "but for" and "proximate" cause of the plaintiff's injury. *Holmes*, 503 U.S. at 265–269, 112 S.Ct. 1311. *See also Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir.1992). To decide whether a plaintiff's RICO damages proximately resulted from defendants' conduct, the *Holmes* Court looked to the common law for guidance. In so doing, it focused primarily on one element of proximate cause: the directness of the relationship "between the injury asserted and the injurious conduct alleged." 503 U.S. at 268, 112 S.Ct. 1311. This requirement of a direct relation was held to *generally* preclude recovery by "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." *Id.* at 268–69, 112 S.Ct. 1311. Applying the Clayton Act to RICO, the *Holmes* Court found that the plaintiff's claims were insufficiently direct to show proximate causation. *Id.* at 267–68, 112 S.Ct. 1311.[36]

---

**35.** Plaintiffs claim that they were directly injured by defendants' conduct. . Having determined that plaintiffs have standing under the Ohio Corrupt Activity Act even if they were not directly injured, the Court need not reach this issue with regard to Counts XIV, XV, and XVI of the Amended Complaint.

**36.** In *Holmes*, the Supreme Court held that the plaintiff, Securities and Investor Protection Corporation ("SIPC"), had not met the proximate cause requirement and thus had no standing to bring suit under RICO. SIPC is a private non-profit corporation, created pursuant to the Securities Investors Act, which most broker-dealers are required by law to join and which has a statutory duty to advance funds to reimburse the customers of member broker-dealers that are unable to meet their obligations. 503 U.S. at 261, 112 S.Ct. 1311.

SIPC brought a civil RICO action alleging that former members of a brokerage firm conspired

However, in *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the Supreme Court broadly afforded standing to health care clinics to bring a claim that defendants threatened or used actual force, violence, or fear against clinic employees, doctors, and patients. Alleging that defendants conspired to use intimidation against doctors and patients, the plaintiff health organizations made viable claims under RICO.

In *NOW*, the Court found standing, though the intimidating acts were largely directed against patients and employee physicians. Thus, in *NOW*, the Supreme Court allowed clinics to make claims for damages resulting from acts directed at others.

▮ Lower courts echo the Supreme Court in finding that standing to bring a RICO claim is not always limited to those directly injured.[37] *See Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143 (5th Cir.1997) (to establish standing under RICO subsection that provides for treble damages for injuries to business or property, the plaintiff must show (1) RICO violation, (2) injury to business or property, and (3) injury proximately caused by RICO violation); *Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir.1994) (rejecting adoption of "a rule that only injuries suffered by the immediate victim of a predi-

cate act satisfy the 'by reason of requirement of § 1964(c)'"); *Zervas v. Faulkner*, 861 F.2d 823, 833 (5th Cir.1988) ("requirement that the nexus between the injury and a predicate act be 'direct' may ... be overly restrictive").

In *Mid Atlantic*, plaintiff telephone company accused one of its competitors of violating RICO by defrauding its customers with fictitious charges, enabling it to charge lower rates to entice new subscribers. The plaintiff company alleged that it lost revenues from subscribers whom the competitor defrauded into accepting the fraudulent lower rates of the defendant company. The Fourth Circuit rejected the argument that the plaintiff company lacked standing because the customers were the directly injured parties and its alleged misconduct proximately injured only them.[38]

▮ To decide whether the plaintiff has standing to make claim under RICO, the Court must examine whether others are positioned to make the same claims, whether the plaintiff will have difficulty showing its damages flowed from the defendant's conduct, whether there is a risk of double recovery, and, importantly, whether the defendant's conduct is sufficiently harmful to warrant deterrence. *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311.

---

in a stock manipulation scheme. SIPC said this scheme caused damages of nearly $13 million representing monies that SIPC advanced to cover claims. *See also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3rd Cir. 1998).

**37.** Defendants suggest support from *Firestone v. Galbreath*, 976 F.2d 279 (6th Cir.1992). The case is inapposite. In *Firestone*, beneficiaries of a trust complained that the trust corpus was reduced by theft during another beneficiary's life. The Sixth Circuit found that the decedent's estate had standing to bring an action but the children as beneficiaries did not. Important to this determination, the Sixth Circuit found that under Ohio law the executor, not the heirs, have the right to bring the estate's causes of action. Ohio does not permit heirs to bring these claims for their own, individual, benefit. 976 F.2d at 283. The Sixth Circuit further found that any property was removed before death. Ohio law grants no enforceable rights to potential takers under a will before the testator's death. The *Firestone* plaintiffs had no vested interests until death. 976 F.2d at 284–285.

**38.** The Fourth Circuit explained its finding:

LDS and Rice contend that their customers were the only victims of the alleged fraud and only those customers can assert their rights. They further maintain that any injury to Mid Atlantic stemmed from the independent intervening acts of Mid Atlantic customers after LDS's solicitations. It follows, the appellees argue, that the solicitations could not have been the proximate cause of Mid Atlantic's injuries.

We are unable to agree. In *Brandenburg*, 859 F.2d at 1189, it was recognized that "the legal cause determination is properly one of law for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg* also explained that proximate causation requires a nexus between the proscribed acts and the injuries. *Id.* at 1187. We did not, however, intend to establish a rule that only injuries suffered by the immediate victim of a predicate act satisfied the "by reason of" requirement of § 1964(c). *Mid Atlantic*, 18 F.3d at 263.

As described above, the Court finds sufficient standing for this case to go on. First, under RICO, participant smokers cannot make claim for medical bills. The medical expenses incurred by plaintiffs represent damage to the business and property of the Plaintiffs Funds, not to individual smokers. *See Steele v. Hospital Corp. of America,* 36 F.3d 69, 70 (9th Cir.1994). In *Steele,* the Ninth Circuit examined a RICO claim brought by hospital patients complaining of over billing. Because insurance had paid the charges, the Ninth Circuit found that the insurer had suffered the damages, not the patient:

> The district court explained that it was the insurance companies and not the patients themselves who suffered financial loss from the allegedly fraudulent health care billings.... It is not enough that the patients show that their insurance company had to pay out more than it otherwise would have without the alleged RICO violation. This does not constitute financial loss to them.

36 F.3d at 70.

Next, the plaintiffs do not seek personal injury damages, such as pain and suffering or wrongful death damages. Following *Steele,* the Court finds that individual smokers cannot make claim for medical expenses incurred by insurers or trust funds. Because others cannot make claims under RICO for these damages, the Court finds no others are positioned to make the same claims. There is scant reason to fear that defendants will be subjected to double recovery.

While defendants say the plaintiffs will have difficulty showing that their damages

flowed from the defendants' conduct, the Court finds this argument insufficient to stop this action at this stage. While disputed, the Court finds that plaintiffs make plausible claims that defendants' conduct damaged them in their business and property.

Finally, plaintiffs allege conduct that, if believed, has had extremely deleterious consequences upon plaintiffs. Having alleged such consequences, the Court finds the Amended Complaint avers conduct sufficiently harmful as to warrant deterrence. *Holmes,* 503 U.S. at 269, 112 S.Ct. 1311.

### D. Plaintiffs' State and Federal Law RICO Claim—Damage to Property

■ Beyond arguing for dismissal of the Ohio Pattern of Corrupt Activity Act claims for standing reasons, defendants say plaintiffs cannot bring this action because plaintiffs cannot allege the defendants damaged them in their business or property. Rather, defendants suggest the plaintiffs' action under the Ohio RICO law is to recover for damages resulting from physical injury.

■ Only a person "injured in his business or property"[39] may recover damages under RICO. 18 U.S.C. § 1964(c). RICO excludes from its ambit damages for personal injury.[40] Claims for personal property injuries are also not cognizable under RICO. *See, e.g., Genty v. Resolution Trust Corp.,* 937 F.2d 899, 918 (3rd Cir.1991); *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 644 (6th Cir. 1986). "[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."

**39.** The "injury to business or property" language in 18 U.S.C. § 1964(c) was taken from Section 4 of the Clayton Act, 15 U.S.C. § 15. The United States Supreme Court has held that this language has "restrictive significance" in that "it would, for example, 'exclude personal injuries suffered.'" *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Case law interpreting the Clayton Act has been persuasive and heavily relied upon by courts addressing issues involving RICO. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267-68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

**40.** The Sixth Circuit has held that economic losses resulting from physical injuries are not dam-

ages to "business or property" within the meaning of RICO:

> [W]hether [the plaintiff] can show a financial loss does not, by definition, establish that she has suffered a business or property injury within the meaning of § 1964(c). Most personal injuries—loss of earnings, loss of consortium, loss of guidance, mental anguish, and pain and suffering, to name a few—will entail pecuniary consequences. Perhaps the economic aspects of such injuries could, as a theoretical matter, be viewed as injuries to "business or property" but engaging in such metaphysical speculation is a task best left to philosophers, not the federal judiciary.

*Doe v. Roe,* 958 F.2d 763, 770 (7th Cir.1992).

*Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

The requirement that a plaintiff suffer an injury to its "business or property" means that the plaintiff must show a proprietary or economic type of damage. *See, e.g., Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees.").

In the instant case, the Court finds that plaintiffs have sufficiently alleged injury to their "business or property" to withstand dismissal under Fed.R.Civ.P. 12(b)(6). Plaintiffs allege that the defendants' conduct has required them to incur significant costs and expenses attributable to tobacco-related diseases. While related, the Court finds that plaintiffs' injuries are distinct from the personal injury claims of smokers. Plaintiffs have sufficiently stated RICO's injury element.

## V. Plaintiffs' antitrust claims

In Counts IV and X of the Amended Complaint, the plaintiffs make antitrust claims under federal and state law.[41] In their Amended Complaint, plaintiffs allege that defendants have conspired to restrain trade and inhibit competition by suppressing the development and marketing of safer, less addictive tobacco products and by agreeing in furtherance of this conspiracy to conceal information concerning the negative health attributes of their products. Plaintiffs say that the defendants have restrained competition in the market for safer tobacco products. Because of this purported restraint, plaintiffs allege the Plaintiffs Funds incurred substantial costs to treat the tobacco-related illnesses of their participants.

In their motion to dismiss, defendants argue that the plaintiffs have suffered no antitrust injury, that the plaintiffs lack antitrust standing, and that the plaintiffs fail to adequately allege an antitrust violation.

Although the federal and state antitrust statutes are worded slightly differently, the goals are the same. Both condemn combinations having for their purpose restraints on trade or commerce. Ohio courts interpret the Valentine Act in light of federal judicial construction of Section 1 of the Sherman Act. *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.,* 63 Ohio St.2d 201, 204, 407 N.E.2d 507 (1980). See also *Re/Max Intern., Inc. v. Realty One, Inc.,* 924 F.Supp. 1474 (N.D.Ohio 1996). A review of defendants' arguments regarding the Sherman Act will encompass the Ohio claims as well. *See Richter Concrete Corp. v. Hilltop Basic Resources,* 547 F.Supp. 893, 920 (S.D.Ohio 1981), *aff'd,* 691 F.2d 818 (6th Cir.1982) (plaintiff's failure to prove its claims under Sherman Act was a failure to prove claim under Valentine Act).

### A. Antitrust injury

Defendants say that plaintiffs have not suffered an antitrust injury. Congress intended the Sherman Act to protect only against injury to the competitive process, not as a substitute for common law tort claims. Defendants argue that the increased health care costs the Funds claim are not the type of injury to "business or property" for which the antitrust acts permit recovery.

To assert a claim for damages under the antitrust statutes, one must be injured in his "business or property." *See* 15 U.S.C. § 15(a). A plaintiff must allege specific "antitrust injury." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). An injury, "although causally related to an antitrust violation, nevertheless will not qualify as an 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Supreme Court found that limits must be placed upon those who might make claim under the antitrust laws:

**41.** Count IV is based on a violation of the Sherman Act, 15 U.S.C. § 1, *et seq.* Count X is based on claimed violations of the Valentine Act, Ohio Rev.Code § 1331, *et seq.*

An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." ... It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.... [I]ndeed, the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that will defeat its broad remedial objective.... [T]he courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of "proximate cause." In applying that elusive concept to this statutory action, we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

457 U.S. at 476–78, 102 S.Ct. 2540 (citations omitted).

■ In part, the Amended Complaint claims the defendants conspired to stop the development of safer cigarettes. Private standard-setting associations "have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anti-competitive harm. Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (citations omitted). Because the stifling of competition in product quality is of the type that Congress designed the antitrust laws to address, the Court finds that defendants' arguments on this issue fail.

Defendants also raise the separate argument that this Court should dismiss plaintiffs' antitrust claims in the Amended Complaint because plaintiffs cannot show proximate relationship to defendants' conduct. In *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court examined whether the plaintiff-unions had sufficiently alleged antitrust injury. To decide whether the plaintiffs there had sufficiently alleged antitrust injury, the *California* Court required the plaintiff to allege both injury in fact and a proximate relationship. The Supreme Court identified factors used for this determination:

Other relevant factors—the nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement of the Union's antitrust claim.

459 U.S. at 545, 103 S.Ct. 897.

As previously discussed regarding defendants' motion to dismiss plaintiffs' RICO claim, the Court finds sufficient allegations to support a finding of proximate causation as for the antitrust injuries. The Court finds little potential for duplicative recovery or apportionment of damages. As described, cigarette smoking fund beneficiaries do not have standing to bring claim for personal injuries under the Clayton Act. Under that law, beneficiaries are restricted to bringing claims for injuries to their business or property. There is little risk of double recoveries against defendants.

For similar reasons, there is little difficulty with an apportionment of damages. There are no more direct victims of the alleged conspiracy who have standing to bring claims under the antitrust laws.

■ Separately, the defendants argue that plaintiffs' claims are for personal injuries and that plaintiffs cannot make antitrust claim for such injuries. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (while consumers cannot make claim for personal injuries under

§ 4 of the Clayton Act, they can make claim for having to pay a higher price for goods purchased for personal use because of antitrust violations).

Section 4 of the Clayton Act allows civil recovery of treble damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). As in the RICO context, the requirement that a plaintiff suffer an injury to his "business or property" means that the plaintiff must show a proprietary or economic type of damage. Here, plaintiffs allege that defendants' conduct has resulted in a substantial increase in the cost of medical care for the participants and beneficiaries. Plaintiffs say the defendants have required them to bear these increased costs.

 To make a claim under § 4 of the Clayton Act, a plaintiff need not prove that the antitrust violation was "the sole or 'but for' cause of his injury. It is enough that the challenged conduct is a material cause of that injury. '[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury....'" Allied Accessories & Auto Parts Co. v. General Motors Corp., 901 F.2d 1322, 1325 (6th Cir.1990) (quoting Zenith Corp. v. Hazeltine, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

Plaintiffs allege their tobacco-related health care costs were greatly increased by the defendants' anti-competitive restriction of product choice and suppression of product information.[42] The Court finds that plaintiffs sufficiently allege an antitrust conspiracy that resulted in proprietary or economic injury to plaintiffs' "business or property."

B. Standing to Assert Antitrust Claims

 Even if plaintiffs can show injury under Section 4 of the Clayton Act, defendants say the plaintiffs do not have standing to make antitrust claims. Antitrust standing is an independent requirement that must be satisfied to obtain legal or equitable relief in an antitrust action. Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). The Court finds this

argument fails, largely for the reasons previously discussed.

In Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Supreme Court noted that "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." In quoting from Judge Andrews' dissent in Palsgraf, the McCready court limited the right to make antitrust claims to those proximately injured: "What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point." Id. at 477, 102 S.Ct. 2540.

 As previously discussed, a court determining antitrust standing must evaluate (1) the nature of the damages sought, (2) whether the injury is of the type that the antitrust laws were intended to remedy, (3) the risk of duplicative recoveries of complex damages apportionment, and (4) the presence of more direct victims of the antitrust violation who can bring claim. Associated Gen. Contractors, Inc., 459 U.S. at 537–45, 103 S.Ct. 897.

The Court finds that plaintiffs have standing to make antitrust claims. The Amended Complaint alleges economic injury to the plaintiffs' businesses through expenses increased by collusion to stop the introduction of safer cigarettes. The Court finds this to be the type of injury the antitrust laws were directed to remedy. The Court also finds little risk of duplicative recovery or complex damage apportionment. Any such risk is obviated by defendants' rights to set off amounts otherwise paid in damages and settlement for the same injuries. Finally, the Court finds no more directly injured victims who could bring antitrust claims, first, because the antitrust laws do not allow an action for personal injury, and second, because plaintiffs-funds are better positioned to make such claims.

For these reasons, the Court denies defendants' motion to dismiss Counts IV and X of the Amended Complaint.

42. Amended Complaint at ¶ 300.

## VI. Voluntarily undertaken duty

In Counts VI and VII, plaintiffs make claims for breach of voluntarily undertaken duties.[43] Defendants seek dismissal of these causes of action. In seeking dismissal, defendants contend that the plaintiffs must allege physical harm and that they have not. Defendants also seek dismissal on grounds that the plaintiffs' economic losses are not recoverable in this action. Further, defendants say that their conduct did not increase the risk of harm to the Funds.

As to these causes of action, plaintiffs claim that defendants voluntarily agreed to undertake studies regarding the effect of tobacco products and promised to reveal all material facts about tobacco use, health and addiction uncovered by their research. In 1954, defendants published the "Frank Statement." With that statement, defendants promised to take "an interest in people's health as a basic responsibility," and "pledged aid and assistance to the research effort into all phases of tobacco use and health."[44] Beyond the 1954 "Frank Statement," plaintiffs say defendants otherwise represented that they would monitor and report on the health consequences of smoking.

Under Ohio law, one who gratuitously undertakes a voluntary act assumes the duty to be careful under the circumstances. *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 202, 423 N.E.2d 831 (1981); *Briere v. Lathrop Co.*, 22 Ohio St.2d 166, 258 N.E.2d 597 (1970); Prosser on Torts § 56, at 343–348.

The Restatement (Second) of Torts § 323 describes a cause of action for a voluntarily undertaken duty. That section provides:

Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other

for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323, ch. 12 (1965).

Although the Ohio Supreme Court has not expressly adopted § 323 of the Restatement, it has been cited with approval by the Ohio Supreme Court and several courts of appeals of this state. *See, e.g., Seley,* 67 Ohio St.2d at 202, 423 N.E.2d 831; *Briere,* 22 Ohio St.2d at 172, 258 N.E.2d 597; *Wissel v. Ohio High Sch. Athletic Ass'n,* 78 Ohio App.3d 529, 605 N.E.2d 458 (Ohio App.1st Dist.1992); *King v. Lindsay,* 87 Ohio App.3d 383, 622 N.E.2d 396 (Ohio App.10th Dist.1993).

Under Ohio law, a claim for breach of a voluntarily undertaken duty must allege physical injury. In *Hinton v. United States Postal Service,* 68 F.3d 474 (TABLE) (6th Cir.1995) (unpublished), the court described voluntary duty under Ohio law:

Under the Good Samaritan doctrine, "one who voluntarily assumes a duty must perform that duty with reasonable care." *Thomas v. Tennessee Valley Authority,* 769 F.2d 367, 370 (6th Cir.1985). However, "[r]ecovery under the Good Samaritan Doctrine is limited to physical harm." *Shaner v. United States,* 976 F.2d 990, 994 (6th Cir.1992), *cert. denied,* 507 U.S. 1051, 113 S.Ct. 1944, 123 L.Ed.2d 650 (1993) (citations omitted).

*Hinton,* 68 F.3d at 474.

Plaintiffs have previously said that "[p]laintiffs do not seek to recover for tobacco-related personal injuries suffered by Fund participants; rather, plaintiffs' claims are for economic injuries." [Doc. 63, at 4–5]. In the Amended Complaint, plaintiffs have dis-

43. In Count VI, plaintiffs allege an intentional breach of a voluntarily undertaken duty. In Count VII, plaintiffs allege a negligent breach of a voluntarily undertaken duty.

44. Defendants publicly disseminated the "Frank Statement," which appeared in 448 newspapers across the nation in 258 cities. According to Defendants, this was done because "people are entitled to know where we stand on this matter and what we intend to do about it." Amended Complaint at ¶ 105.

claimed seeking damages for personal injuries.

Recognizing that the Amended Complaint does not allege physical harm, plaintiffs suggest that they only seek to recover for intentional breach of a voluntarily assumed duty, not for a negligent breach of an assumed duty. This argument is disingenuous. Count VII clearly states a cause of action for "Negligent Breach of Special Duty." Moreover, the Court finds that the attempt to characterize the claim as an intentional tort does not change the elements of the cause of action.[45]

Given that plaintiffs do not allege physical harm or personal injury damages, the Court concludes that plaintiffs fail to state a cause of action for breach of voluntarily undertaken duties. Therefore, the Court grants defendants' motion to dismiss Counts VI and VII of the Amended Complaint.

### VII. Conspiracy claim

Defendants move to dismiss Count XI of the Amended Complaint. In that count, plaintiffs seek to state a claim for conspiracy. As grounds for its motion to dismiss Count XI, defendants say that conspiracy, of itself, furnishes no cause of civil action.

In Ohio, civil conspiracy is "a malicious combination of two of more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995) (citing *LeFort v. Century 21–Maitland Realty Co.*, 32 Ohio St.3d 121, 126, 512 N.E.2d 640 (1987)). See also *Gosden v. Louis*, 116 Ohio App.3d 195, 218, 687 N.E.2d 481 (Ohio App.9th Dist.1996).

An actionable conspiracy must be based upon an actionable underlying tort. *Stiles v. Chrysler Motors Corp.*, 89 Ohio App.3d 256, 266, 624 N.E.2d 238 (Ohio App.6th Dist.1993); *Miskinis v. Chester Twp. Park Dist.*, 112 Ohio App.3d 466, 472, 679 N.E.2d 39 (Ohio App.11th Dist.1996) ("A claim of civil conspiracy requires the plaintiff

to prove a malicious combination of two or more persons causing injury to person or property and the existence of an unlawful act independent from the actual conspiracy.").

In seeking dismissal of plaintiffs' conspiracy claim, the defendants argue that all of plaintiffs' underlying causes of action should fail. Defendants say that if all plaintiffs' other causes of action fail, then plaintiffs' conspiracy claim must also fail. Although defendants' argument is logically correct, it is inapplicable here. The Court has found that plaintiffs state causes of action under RICO, the Ohio Corrupt Activity Act, and federal and state antitrust laws. Having stated such causes, the Court concludes that plaintiffs' have sufficiently stated a cause of action for civil conspiracy.

Accordingly, the Court denies defendants' motion to dismiss Count XI of the Amended Complaint.

For the foregoing reasons, the Court grants defendants' motions to dismiss plaintiffs' claims for breach of voluntary undertaken duty averred in Counts VI and VII of the Amended Complaint. The Court denies defendants' motions to dismiss plaintiffs' remaining claims under federal RICO (Counts I, II, III), under the Ohio Corrupt Activity Act (Counts XIV, XV, and XVI), for antitrust (Counts IV and X), and for civil conspiracy (Count XI).

IT IS SO ORDERED.

---

**45.** Plaintiffs also cite to authority from other jurisdictions to support their claim that physical injury is not required. *See, e.g., City and County of San Francisco v. Philip Morris, Inc.*, 957 F.Supp. 1130, 1142–43 (N.D.Cal.1997); *State, by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490 (Minn.1996). The Court finds the discussion of voluntarily assumed duty fails to directly speak to whether a showing of physical harm is required. But more importantly, clear Ohio authority teaches that physical harm is an element of a claim for breach of a voluntarily assumed duty.